**ESTATE OF H. Floyd SHERROD, H. Floyd Sherrod, Jr. and Estalee Sherrod Sandlin, Co-Executors, Petitioners-Appellees,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.**

No. 84–7682.

United States Court of Appeals, Eleventh Circuit.

Oct. 25, 1985.

Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Chief, Appellate Section, Robert S. Pomerance, Jonathan S. Cohen, Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellant.

J. Gilmer Blackburn, Blackburn & Maloney, P.C., Mark Daniel Maloney, Decatur, Ala., for petitioners-appellees.

Before HILL and CLARK, Circuit Judges, and MOYE [*], Chief District Judge.

MOYE, Chief District Judge:

The government appeals from a decision of the tax court, 82 T.C. 523, holding that certain property of the estate of H. Floyd Sherrod (the estate) qualified for special use valuation for federal estate tax purposes under 26 U.S.C. § 2032A of the Internal Revenue Code of 1954. We reverse.

## I.

### Tax Court Proceedings

The relevant facts, as reflected in the tax court's findings, the parties' stipulations, and the evidence adduced at trial, are as follows:

H. Floyd Sherrod (the decedent) died on December 1, 1977, at the age of 87. Included in his estate were 1,478 acres of land for which the executors claimed special use valuation for federal estate tax purposes under section 2032A of the Internal Revenue Code of 1954. The land was in the form of two non-contiguous tracts, about three miles apart, in Colbert County, Alabama, one of 258 acres and the other of 700 acres, and a single tract of 520 acres in Madison County, Alabama, about 100 miles away. The total acreage of 1,478 fit neatly into three categories of land: (1) 270 acres was crop land used for growing row crops; (2) 1,108 acres was timberland; and, (3) 100 acres was pasture land. There is no dispute that each of these sections was best suited for its designated use.

Of the land in Colbert County, the tract of 700 acres was all in timber, whereas the 258-acre tract was divided among timber

* Honorable Charles A. Moye, Jr., Chief U.S. District Judge for the Northern District of Georgia, sitting by designation.

(48 acres), pasture (40 acres), and crop land (170 acres). At the time of the decedent's death, the timberland was in a state of natural forestation; the last cutting had occurred in 1940 or 1941. During the eight years preceding the decedent's death, the pasture land was not leased or put to any use. The crop land, on the other hand, was rented to an unrelated party. The lease for this land was for a set annual rental that was not dependent on any production which took place on that land.

Of the land in Madison County, the 520-acre tract was divided among timber (360 acres), pasture (60 acres), and crop land (100 acres). This timberland was also in a state of natural forestation; the last cutting had occurred in 1960 or 1961. Out of the 60 acres of pasture land, 28 acres were not leased or put to any use. However, the remaining 32 acres of pasture land and all 100 acres of crop land were rented to an unrelated party. These leases were also for set annual rentals not dependent on production.

During his lifetime, the decedent farmed some portions of this land. However, in 1952, twenty-five years before his death, he discontinued most of his farming activities. The decedent sold his cattle and all of his farming equipment. From then until 1972, the decedent made no attempt, either directly or indirectly, to look after, raise or grow any row crops or cattle. Instead he rented out the portions of his land best suited for row crops and pasture. He did, however, during this twenty year span, continue to look after his timberland in order to protect it from trespassers, insect infestation, and disease. He did this by

inspecting the timberland several times a year either alone or with his son, H. Floyd Sherrod, Jr. He and his son also maintained regular contact with the tenants and adjoining landowners. As well, the decedent paid all of the local taxes on the properties in Colbert and Madison Counties.

In the fall of 1972, the decedent entered a nursing home where he remained until his death. Just prior to entering the nursing home, the decedent executed a revocable trust into which he transferred all of his property including the 1,478 acres in question. He was the sole beneficiary of the trust during his life; his son and daughter were the trustees and also the beneficiaries of the trust at the time of his death. In 1973, the decedent's son took over the sole management of the 1,478 acres that he had previously managed with his father. Thereafter, the son alone negotiated the annual rental agreements with the tenants on the crop and pasture land, inspected the timber, maintained contacts with adjoining landowners, and, paid the local taxes on the property.

On the estate's federal estate tax return, the executors elected to value the 1,478 acres under the special use valuation provisions provided by 26 U.S.C. § 2032A of the Internal Revenue Code of 1954. On audit, the Commissioner disallowed the estate's claim to special use valuation. He therefore valued all of the subject property in the gross estate at its fair market value, based on its highest and best use, at the date of the decedent's death, and determined a deficiency in estate tax.[1] The ex-

---

1. On the returns, the executors claimed special use valuation for the timber on the land as well as for the underlying land itself. During the proceedings below, however, the parties agreed that the timber did not qualify for special use valuation. Accordingly, the parties stipulated to the following values for the Colbert and Madison County land:

| Description | Acres | Fair Market Value | Special Use Value |
|---|---|---|---|
| **Colbert County** | | | |
| 258-acre tract | | | |
| Crop land | 170 | $188,579 | $ 50,678 |
| Pasture land | 40 | 44,371 | 4,916 |
| Timberland | 48 | 9,708 | 2,354 |
| Total | 258 | $242,658 | $ 57,948 |
| 700-acre tract | | | |
| Timberland | 700 | $141,572 | $ 34,334 |
| Total Colbert County | 958 | $384,230 | $ 92,282 |
| **Madison County** | | | |
| Crop land (100 acres) and rented pasture land (32 acres) | 132 | $ 83,655 | $ 34,304 |
| Pasture land (not rented) | 28 | 17,745 | 3,560 |
| Timberland | 360 | 78,800 | 18,459 |
| Total Madison County | 520 | $180,200 | $ 56,323 |
| **Total Colbert and Madison Counties** | 1,478 | $564,430 | $148,605 |

ecutors petitioned the tax court for a redetermination of the deficiency.

In the tax court, the Commissioner argued that neither the decedent nor a member of his family put any part of the 1,478 acres to a "qualified use", within the meaning of section 2032A, at any time during the eight years preceding the decedent's death. Specifically, the Commissioner took the position that the activities of the decedent and his son during that period failed to reach the level of an active trade or business in which they materially participated, either with regard to the timberland or to the rest of the land.

The tax court, however, held for the estate. The court observed that the decedent and his son had exercised management and control over the acreage by paying the taxes on the property, inspecting the timberland, keeping in contact with the tenants and adjoining landowners, negotiating the rental agreements, and deciding whether to retain or sell the property. In the court's view, those practices were consistent with rules of sound land management and with the practices of others who held similar types of property.

Based on those findings, the tax court concluded that, until 1972, the decedent and his son had conducted an active farming business consisting primarily of growing and caring for 1,108 acres of timber; that this business also included the management of another 370 acres (i.e., the crop and pasture land) which constituted part of the total acreage on which the timber was located; that the management of the 370 acres was performed in such a manner that it was an integral part of, and, therefore, inseparable from, the management of the 1,108 acres of timber; and that after 1972, the decedent's son carried on this farm busines on his behalf.[2] This appeal followed.

## II.

### Discussion

■ As a general rule, when any property is valued for the purpose of imposing a federal tax—whether income, gift, or estate—the dollar amount assigned to it rests on the notion of fair market value. *See Rushton v. Commissioner*, 498 F.2d 88, 89 (5th Cir.1974). Similarly, in implementing section 2031(a) of the Internal Revenue Code of 1954,[3] the usual estate tax provision, the general principle of the Treasury Regulations is that the fair market value of the property controls.[4]

In enacting 26 U.S.C. § 2032A in 1976, Congress provided a limited exception to the aforementioned general rule with respect to the valuation for federal estate tax purposes of certain family farms and other closely-held businesses. See Section 2032A of the Internal Revenue Code of 1954, as added by Section 2003(a), Tax Reform Act

In addition, the parties further stipulated that the adjusted value of the gross estate (taking all the properties into account at their fair market value) was $869,806.45. Thus, the fair market value ($564,430) of the property for which special use valuation was claimed exceeded 50 percent of the adjusted gross estate. See Sec. 2032A(b)(1).

**2.** In the second phase of its opinion, the court ruled that it lacked jurisdiction to determine whether the estate qualified to pay its tax in installments under Section 6166A. The court noted that its jurisdiction was confined to determining tax deficiencies (*i.e.,* whether the amount of tax owed by a taxpayer exceeded the tax reported as due on his return), and that the question whether the estate could pay its tax in installments would not create, or affect the amount of, any such deficiency. This Court expresses no opinion on this matter as it was not briefed or argued by either party on appeal.

**3.** 26 U.S.C. § 2031 Definition of Gross Estate

(a) [as amended by Sec. 18(a)(1), Revenue Act of 1962, Pub.L. No. 87–834, 76 Stat. 960] *General.*—The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated.

**4.** The fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Treasury Regulations on Estate Tax (1954 Code), Sec. 20.2031–1(b).

of 1976, Pub.L. No. 94–455, 90 Stat. 1520, and amended by Sec. 421(b)(1), Economic Recovery Tax Act of 1981, Pub.L. No. 97–

**5.** In pertinent part, this section reads as follows:
SEC. 2032A [as added by Sec. 2003(a), Tax Reform Act of 1976, Pub.L. No. 94–455, 90 Stat. 1520].
VALUATION OF CERTAIN FARM, ETC., REAL PROPERTY.

(a) *Value based on use under which property qualifies.—*
(1) *General rule.—*If—
(A) the decedent was (at the time of his death) a citizen or resident of the United States, and
(B) the executor elects the application of this section and files the agreement referred to in subsection (d)(2),
then for purposes of this chapter, the value of qualified real property shall be its value for the use under which it qualifies, under subsection (b), as qualified real property.

\*     \*     \*     \*     \*     \*

(b) *Qualified real property.—*
(1) [as amended by Sec. 702(d)(1), Revenue Act of 1978, Pub.L. No. 95–600, 92 Stat. 2763, and by Sec. 421(b)(1), Economic Recovery Tax Act of 1981, Pub.L. No. 97–34, 95 Stat. 172]
*In general.—*For purposes of this section, the term "qualified real property" means real property located in the United States which was acquired from or passed from the decedent to a qualified heir of the decedent and which, on the date of the decedent's death, was being used for a qualified use by the decedent or a member of the decedent's family, but only if—
(A) 50 percent or more of the adjusted value of the gross estate consists of the adjusted value of real or personal property which—
·(i) on the date of the decedent's death, was being used for a qualified use by the decedent or a member of the decedent's family, and
(ii) was acquired from or passed from the decedent to a qualified heir of the decedent.
(B) 25 percent or more of the adjusted value of the gross estate consists of the adjusted value of real property which meets the requirements of subparagraphs (A)(ii) and (C),
(C) during the 8-year period ending on the date of the decedent's death there have been periods aggregating 5 years or more during which—
(i) such real property was owned by the decedent or a member of the decedent's family and used for a qualified use by the decedent or a member of the decedent's family, and
(ii) there was material participation by the decedent or a member of the decedent's family in the operation of the farm or other business, and
(D) such real property is designated in the agreement referred to in subsection (d)(2).

34, 95 Stat. 172. Section 2032A is a highly technical provision of the Internal Revenue Code.[5] The basic intent behind this provi-

(2) *Qualified use.—*For purposes of this section, the term "qualified use" means the devotion of the property to any of the following:
(A) use as a farm for farming purposes, or
(B) use in a trade or business other than the trade or business of farming.
(3) *Adjusted value.—*For purposes of paragraph (1), the term "adjusted value" means—
(A) in the case of the gross estate, the value of the gross estate for purposes of this chapter (determined without regard to this section), reduced by any amounts allowable as a deduction under paragraph (4) of section 2053(a), or
(B) in the case of any real or personal property, the value of such property for purposes of this chapter (determined without regard to this section), reduced by any amounts allowable as a deduction in respect to such property under paragraph (4) of section 2053(a).
(4) [as added by Sec. 421(b)(2), Economic Recovery Tax Act of 1981, *supra*] *Decedents who are retired or disabled.—*
(A) *In general.—*If, on the date of the decedent's death, the requirements of paragraph (1)(C)(ii) with respect to the decedent for any property are not met, and the decedent—
(i) was receiving old-age benefits under title II of the Social Security Act for a continuous period ending on such date, or
(ii) was disabled for a continuous period ending on such date,
then paragraph (1)(C)(ii) shall be applied with respect to such property by substituting "the date on which the longer of such continuous periods began" for "the date of the decedent's death" in paragraph (1)(C).
(B) *Disabled defined.—*purposes of subparagraph (A), an individual shall be disabled if such individual has a mental or physical impairment which renders him unable to materially participate in the operation of the farm or other business.

\*     \*     \*     \*     \*     \*

(e) *Definitions; special rules.—*For purposes of this section—
(3) *Certain real property included.—*In the case of real property which meets the requirements of subparagraph (C) of subsection (b)(1), residential buildings and related improvements on such real property occupied on a regular basis by the owner or lessee of such real property or by persons employed by such owner or lessee for the purpose of operating or maintaining such real property, and roads, buildings, and other structures and improvements functionally related to the qualified use shall be treated as real property devoted to the qualified use.
(4) *Farm.—*The term "farm" includes stock, dairy, poultry, fruit, furbearing animal, and

sion was to grant relief to heirs of family farms, who might otherwise find that valuation of their newly-inherited farmland at its "highest and best use" would produce such a large estate tax liability that they would have to liquidate the farm in order to pay the tax. See H.R.Rep. No. 94–1380, 94th Cong., 2d Sess. at 21–22, U.S.Code Cong. & Admin.News pp. 2897, 3375, 3376 (1976–3 Cum.Bull. (Vol. 3) 735, 755–756). Accordingly, section 2032A permits qualifying real estate to be valued for estate tax purposes on the basis of its "actual use". "Actual use valuation" has the effect of reducing the estate tax bill considerably because, typically, working family farms do not yield high annual profits.[6] However, before section 2032A can be applied to real estate, several requirements established by Congress under that section must be met. The focus of the dispute in the case before us centers on two of these requirements, the "material participation" and the "qualified use" tests of section 2032A(b), both of which must be satisfied if any property of the estate is to receive special valuation treatment. The Court will now examine each of these two re-

quirements as they pertain to the facts of this case.

■ The "material participation" test looks to the eight year period immediately preceding a decedent's death. During that time, there must be at least five years during which there was material participation on the part of the decedent or a member of his family with respect to the operation of a business on "qualified real property". Furthermore, the fair market value of such property must constitute at least 25 percent of the fair market value of the estate as a whole. Section 2032A(b)(1)(B), and (b)(1)(C). If both of these conditions are not met, none of the estate's property will be eligible for special use valuation. In general, there are two types of activity that can qualify as material participation if pursued to a sufficient degree by the decedent or by a member of his family. The two types are (1) actual physical labor on the farm; and, (2) sufficient involvement in important management decisions. Treasury Regulations, Sec. 20.2032A–3(e)(1). *See also* S.Rep. No. 97–144, 97th Cong., 1st Sess. at 133, 134–

---

truck farms, plantations, ranches, nurseries, ranges, greenhouses or other similar structures used primarily for the raising of agricultural or horticultural commodities, and orchards and woodlands.

(5) *Farming purposes.*—The term "farming purposes" means—

(A) cultivating the soil or raising or harvesting any agricultural or horticultural commodity (including the raising, shearing, feeding, caring for, training, and management of animals) on a farm;

(B) handling, drying, packing, grading, or storing on a farm any agricultural or horticultural commodity in its unmanufactured state, but only if the owner, tenant, or operator of the farm regularly produces more than one-half of the commodity so treated; and

(C)(i) the planting, cultivating, caring for, or cutting of trees, or

(ii) the preparation (other than milling) of trees for market.

(6) *Material participation.*—Material participation shall be determined in a manner similar to the manner used for purposes of paragraph (1) of section 1402(a) (relating to net earnings from self-employment).

(7) *Method of valuing farms.*—

(A) *In general.*—Except as provided in subparagraph (B), the value of a farm for farm-

ing purposes shall be determined by dividing—

(i) the excess of the average annual gross cash rental for comparable land used for farming purposes and located in the locality of such farm over the average annual State and local real estate taxes for such comparable land, by

(ii) the average annual effective interest rate for all new Federal Land Bank loans. For purposes of the preceding sentence, each average annual computation shall be made on the basis of the 5 most recent calendar years ending before the date of the decedent's death.

    \*    \*    \*    \*    \*    \*

6. The tax relief afforded by section 2032A goes beyond simply substituting actual use for highest and best use. Section 2032A(e)(7)(A) prescribes a capitalization of earnings approach, bottomed on the "average gross cash rental for comparable land used for farming purposes." Thus, even if farming is the optimal use of particular land, the nature of farming activities may be such that the current return is relatively low. Since the statute permits an executor to ignore the investment value of the land, and to look only to the current return, it paves the way for substantial write-downs of farm property for estate tax purposes.

135, U.S.Code Cong. & Admin.News pp. 105, 233–235 (1981–2 Cum.Bull. 412, 463–464).[7]

■ In this case, the Commissioner concedes that the fair market value of the timberland in the decedent's estate equalled 26 percent of the fair market value of his estate as a whole. Regarding the second condition, the tax court found that the fact that the control and management of decedent's timber farm business did not take a great deal of time does not mean that there was no material participation by the decedent and, subsequently, by his son. Timber farming does not require the expenditure of much time or labor; trees take a long time to grow and are, by and large, best left to nature. The facts are clear that the decedent and, later, his son inspected the timberland at least twice a year for the 8-year period prior to the decedent's death. The tax court found that the decedent and his son made every managerial decision and performed every act that was necessary in order to carry on the decedent's timber farming business for the last 25 years of the decedent's life. The tax court concluded that such activity constituted a sufficient showing of material participation to satisfy the dictates of section 2032A(b)(1)(C). Given the facts of this case, this Court is not prepared to find that the tax court's conclusion in this regard was incorrect as a matter of law.

■ The "qualified use" test looks at how the real property in question was being used by the decedent or by a member of the decedent's family on the date of the decedent's death. Furthermore, the fair market value of such property, together with that of any related personalty, must equal or exceed 50 percent of the fair market value of the overall adjusted gross estate. Sec. 2032A(b)(1)(A), and (b)(3). This percentage test is intended to confine the statute's benefits to those estates which would in fact be likely to experience a genuine liquidity problem because a major part of the estate's assets is tied up in a farm or other closely-held family business. *See Estate of Geiger v. Commissioner*, 80 T.C. 484, 489 (1983) (special use valuation denied where qualifying farm property amounted to only 42 percent of the gross estate).

In this case, the Commissioner concedes that the decedent's timberland could be considered qualifying real property; however, as previously stated, the fair market value of this property represents only 26 percent of the overall adjusted gross estate.[8] Therefore, unless a sufficient amount of the decedent's crop and pasture land is determined to be qualifying real property or related personalty, the estate will not meet the 50 percent threshold of section 2032A(b)(1)(A) and none of the estate's assets will be entitled to special use valuation.

■ The Court notes initially that the decedent's crop and pasture land do not themselves fall within the qualified use category. Sixty-eight out of the decedent's one hundred acres of pasture land were not put to any use at all. Clearly, this land was not employed in an active trade or business of the decedent or of a member of

---

**7.** The Regulations give additional content to these criteria, as follows (Treasury Regulations on Estate Tax, Sec. 20.2032A–3(e)(2)):

While they need not make all final management decisions alone, the decedent and/or family members must participate in making a substantial number of these decisions. Additionally, production activities on the land should be inspected regularly by the family participant, and funds should be advanced and financial responsibility assumed for a substantial portion of the expense involved in the operation of the farm or other business in which the real property is used. In the case of a farm, the furnishing by the owner or other family members of a substantial portion of the machinery, implements, and livestock used in the production activities is an important factor to consider in finding material participation.

Eight examples in the Regulations spell out variations on this theme and explain the approach of the Treasury to the differing factual situations.

**8.** Even if the fair market value of the timber itself were taken into account along with the timberland, the estate would still fall 17 percent short of reaching the 50 percent threshold.

his family as is called for in the statute. The remaining pasture land and all 270 acres of decedent's crop land were leased to unrelated parties for fixed rentals not based on the production of the land. The legislative history of section 2032A makes clear that, in order for land to qualify for special use valuation, a decedent's financial stake or other involvement in the land must have been more than simply that of a landlord passively collecting a fixed rental from an unrelated tenant. Whether or not the unrelated tenant ran a farm or other business on the land is irrelevant. For the purposes of "qualified use" inquiry, it does not matter to what use a tenant put the land; the focus is on what the decedent did with the land. See H.R.Rep. No. 94–1380, *supra* at 23, U.S.Code Cong. & Admin. News p. 3377 (1976–3 Cum.Bull. (Vol. 3) 757).[9] *See also Schuneman v. United States*, 570 F.Supp. 1327 (C.D.Ill.1983), appeals pending (7th Cir. Nos. 84–2651 & 84–2888); *Estate of Trueman v. United States*, 6 Cl.Ct. 380 (1984); *Estate of Abell v. Commissioner*, 83 T.C. 696 (1984). In this case, it is clear from the facts that the decedent and his son were the prototype of a landlord passively collecting a fixed rental from an unrelated party. Any interest of the decedent and his son in the tenants' farming operations on the rented land fell far short of material participation. There is no evidence in this case that either the decedent or his son had any hand in the managerial decisions relating to the production of row crops on that land, much less that either helped to perform the actual physical labor himself. The fact that the decedent and his son paid the local property taxes, negotiated the rental agreements, and decided from time to time whether to leave their investment in the acreage is of no import; the same could be said of almost any landlord, no matter how "passive" the lease.

■ The executors in this action argue that in examining whether a "trade or business" exists, the same meaning should be given this term for the purposes of section 2032A as is given this term for the purposes of other sections of the Internal Revenue Code, specifically section 162. Section 162 permits the deduction of business expenses in arriving at adjusted gross income provided that the activity involved is a trade or business. Of course, purely investment activity is not a trade or busi-

9. The House Report on the 1976 Act provided in relevant part as follows:

> *Qualifying Real Property.*—Real property may qualify for special use valuation if it is located in the United States and if it is devoted to either (1) use as a farm for farming purposes, or (2) use in a trade or business other than farming. In the case of either of these qualifying uses, your committee intends that there must be a trade or business use. The mere passive rental of property will not qualify. However, where a related party leases the property and conducts farming or other business activities on the property, the real property may qualify for special use valuation. For example, if A, the decedent, owned real property which he leased for use as a farm to the ABC partnership in which he and his sons B and C each had a one-third interest in profits and capital, the real property would qualify for special use valuation.

The relevant Treasury Regulations, promulgated in 1980, draw upon the same active-passive distinction. Treasury Regulations on Estate Tax (1954 Code), Sec. 20.2032A–3(b)(1) (26 C.F.R.), provides in part as follows:

> Under section 2032A, the term trade or business applies only to an active business such as a manufacturing, mercantile, or service enterprise, or to the raising of agricultural or horticultural commodities, as distinguished from passive investment activities. The mere passive rental of property to a party other than a member of the decedent's family will not qualify. The decedent or a member of the decedent's family must own an equity interest in the farm operation. A trade or business is not necessarily present even though an office and regular hours are maintained for management of income producing assets, as the term "business" is not as broad under section 2032A as under section 162.

Treasury Regulations, of course, are written by officials delegated the authority to administer the Code, and must be upheld as long as they implement the congressional mandate in some reasonable fashion. *See e.g., National Muffler Dealers Assn. v. United States*, 440 U.S. 472, 476–477, 99 S.Ct. 1304, 1306–1307, 59 L.Ed.2d 519 (1979). Here, far from departing from Congress' intent, the regulations flesh out the basic concept that a "mere passive rental" or other form of passive investment activity lacks the requisite business character of a qualifying use.

ness for the purposes of section 162. *See Higgins v. Commissioner*, 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783 (1941). In determining whether a trade or business exists for section 162 purposes, one must look upon the activity of the taxpayer. If such activity rises to the level of a trade or business, then the expenses associated with that activity are deductible as business expenses under section 162. The executors urge that it is essentially irrelevant that the activity with respect to an isolated part of the enterprise does not meet the required standard, so long as the sum of the activities constitute a trade or business. By analogy, the executors argue that once this Court determines that the decedent's timber farming operation was a trade or business, then all of the decedent's real property which was utilized in or related to that farming operation should be categorized as qualified real property under section 2032A.

The executors err in stating that Congress intended the words "trade or business" to have the same meaning in section 2032A as elsewhere in the Code. The import of the term "trade or business" is not unitary throughout the tax laws; rather, it may vary depending on the background and wording of the particular provision in which it appears. *See e.g., Snow v. Commissioner*, 416 U.S. 500, 502–503, 94 S.Ct. 1876, 1877–1878, 40 L.Ed.2d 336 (1974). The term, as it relates to section 2032A, should be applied sparingly in light of that section's particular objectives and its consequences for the revenue. *See Estate of Cowser v. Commissioner*, 736 F.2d 1168 (7th Cir.1984). Whatever may be true of section 162, moreover, section 2032A requires "an active trade or business use as opposed to a passive or investment" use on the part of the taxpayer-decedent himself or of a member of the decedent's family. S.Rep. No. 97–144, 97th Cong., 1st Sess. at

133, U.S.Code Cong. & Admin.News p. 233 (1981–2 Cum.Bull. 412, 463–464).

Nonetheless, the tax court appears, in principle, to have embraced the estate's argument. The tax court concluded that the decedent and his son were engaged in an active timber farming business. The tax court also found that the decedent used each of its three types of property in the manner best suited to the nature of its terrain and the quality of its soil which, it felt, was consistent with principles of good land management. The tax court further held that the practice followed by the decedent and his son of renting the crop land to other unrelated parties for fixed annual rentals was also consistent with good land management, because each of the tracts involved was too small to be farmed economically by itself and the two parcels of crop land were too far apart to be worked as a unit.[10] Not only did the tax court feel that such rentals were consistent with good land management but it also found significant the fact that the rentals helped to provide cash for paying annual expenses such as the local taxes for all of the decedent's holdings including his timberland. Under these circumstances, the tax court concluded that the decedent's non-timberland was managed in such a manner that it was an aid to, an integral part of, and inseparable from the management of the timberland. The tax court viewed the decedent's entire acreage as a single logical unit for the purposes of special use valuation under section 2032A and, accordingly, held for the estate. We feel, however, that this decision rested on an erroneous understanding of the law and must be reversed.

Real property physically connected to qualifying farmland is not automatically classified as qualifying real property for purposes of section 2032A. Section

---

**10.** The executors contend on appeal that it was unrealistic to require the decedent, and later his son, to qualify as a row crop farmer as well as a timber farmer for the small amounts of row crop land he owned. However, the decedent's holdings of crop and pasture land were not small in any relevant sense. Although only one-fourth of the total in terms of acreage, these holdings were worth over $100,000 more than the timberland. It is the dollar amount, rather than simply the number of acres, that deserves precedence for purposes of levying the estate tax.

2032A(e)(3) provides the statutorily-pre-scribed means for testing whether or not property that is not itself being put to a qualified use should, nevertheless, be treated as qualifying because of its relationship to other qualifying real property. Specifically, this section provides that non-qualifying real property must be "functionally related" to other qualifying real property.[11] In *Estate of Geiger v. Commissioner*, 80 T.C. 484 (1983), for example, the tax court did not allow the estate to aggregate the fair market value of the personalty from the decedent's hardware operation (11 percent of the decedent's adjusted gross estate) with the fair market value of the assets from the decedent's farmland (42 percent of the decedent's adjusted gross estate) in order to satisfy the 50 percent test of section 2032A(b)(1)(A) because the one business was unrelated to the other. The court further noted that not even real property which was on or contiguous to a farm would have qualified for special use evaluation unless it was functionally related to the farming enterprise. *Id.* at 490.

■ The Commissioner argues, and we agree, that the tax court erred in its application of section 2032A(e)(3) when it treated the decedent's non-timberland as part of an inseparable unit with the decedent's timberland. Whether it was a prudent decision by the decedent and his son to rent the non-timberland or not does not change the fact that Congress has made clear that the mere passive rental of property by the decedent, even if done solely because of age or infirmity, cannot qualify for special use valuation.[12] The tax court suggested that

11. Specifically, if underlying real property passes the 25 percent test of section 2032A(b)(1)(B)—that is, it was put to a qualifying use, there was material participation in the operation of a business on it, and its fair market value equaled or exceeded 25 percent of that of the overall gross estate—then an estate can treat certain connected property as also devoted to the same qualifying use. In addition to property that is "functionally related," this includes a residence located on the land, provided that the residence *is occupied by the owner or lessee of the land in* order to operate the farm or other business being conducted there.

The House Report accompanying the enactment of section 2032A includes the following gloss on section 2032A(e)(3) (H.R.Rep. No. 94–1380, 94th Cong., 2d Sess. at 24, U.S.Code Cong. & Admin. News p. 3378 (1976–3 Cum.Bull. (Vol. 3) 735, 758)):

Qualified real property also includes roads, buildings, and other structures and improvements functionally related to the qualified use. On the other hand, elements of value which are not related to the farm or business use (such as mineral rights) are not to be eligible for special use valuation. For example, if there is an oil lease on a farm, the full value of the mineral rights is to be taken into account for estate tax purposes. Similarly, if there are buildings or other improvements on (or contiguous with) the farm and the buildings or other improvements are neither functionally related to the farm nor qualify as a farmhouse and related improvements, these buildings and other improvements are not treated as qualified farm real property.

12. It can hardly be thought that Congress was unaware that people are less active later in life. Nonetheless, the qualified use test looks to how the property was being employed "on the date of the decedent's death." This can only represent a studied conclusion on the part of the legislature that the relevant question is whether the property was being put to a qualified use or not when the decedent died, not whether a failure to do so can be attributed to the retirement, old age, or infirmity of the decedent, or to some other equally understandable cause. *See, e.g., Schuneman v. United States,* 570 F.Supp. at 1331, where the decedent's longstanding crop-share arrangement, discontinued a year and a half before she died, helped her to meet the material participation requirement but not the test of qualifying use.

Indeed, Congress amended the material participation requirement in 1981, so that the retirement or disability of a decedent is now taken into account, for the estates of decedents dying after December 31, 1981. See section 2032A(b)(4), added by section 421(b)(2), Economic Recovery Tax Act of 1981. Hence, for decedents covered by that provision (which does not apply to decedent here, who died in 1977), the eight-year period for material participation ends on the date that the decedent first receives certain social security retirement benefits, or becomes disabled, instead of on the date of death. The clear negative pregnant of that amendment (which was only for purposes of gauging material participation) is that not even the disability of a decedent has the effect of relaxing the test of qualified use. *A fortiori,* it makes no difference here (any more than it did in *Trueman, Abell,* and *Schuneman*) that decedent's passive lease of his land more or less conformed with what the owners of other such property might do in his situation. Indeed, were the rule otherwise, the restrictions on

the decedent's use of his rental income to pay the local taxes on his property helped to establish a functional relationship between the rented land and the timberland; however, the same could be said of virtually any type of passive investment such as income generated by an oil lease on a farm, one of the examples of an unrelated use cited in the legislative history accompanying section 2032A(e)(3).[13] Furthermore, the estate made no showing that the decedent and his son could not carry on the timber farming operation essentially intact without holding title to the non-timberland. The record shows that 700 acres of the decedent's timberland were in a single tract, with no contiguous crop or pasture land. The record does not even contain a hint that either the decedent or his son had a harder time farming the remaining 408 acres of timberland. Furthermore, the decedent does not appear to have been concerned about access to these 408 acres of timberland as evidenced by the fact that he rented the contiguous land to unrelated parties. In short, the only discernible relationship, functional or otherwise, between the decedent's timberland and his non-timberland is the fact that he owned them both. This is not enough to pass muster under section 2032A(e)(3). As a result, the estate has failed to meet the 50 percent threshold required by 26 U.S.C. § 2032A(b)(1)(A). Accordingly, none of the estate's assets are entitled to special use valuation for federal estate tax purposes under 26 U.S.C. § 2032A of the Internal Revenue Code of 1954.

The judgment of the tax court is REVERSED.

granting special use valuation for passive investment assets would be virtually unenforceable.

**13.** *See* note 11, supra. *See also Trueman v. United States,* 6 Cl.Ct. at 356, in which the court said, "where the use made by a decedent of his

property was an investment use, no hardship to decedent's heirs results from forcing them to sell the property in order to realize its full potential value as an investment."