## Estate of Rebecca Ward, Deceased, Floral Emerson and Reba Harris, Cotrustees and Coexecutrices, Petitioner v. Commissioner of Internal Revenue, Respondent

Docket No. 20600-80.        Filed July 8, 1987.

*Clarence E. Price* and *Karen L. Krodel*, for the petitioner.
*Elsie Hall* and *Russell D. Pinkerton*, for the respondent.

CHABOT, *Judge*: Respondent determined a deficiency in Federal estate tax against petitioner in the amount of $46,331.82. After a concession by petitioner, the issue for decision is whether decedent materially participated in the operation of her farm within the meaning of section 2032A(b)(1)(C)(ii)[1] so as to permit her estate to qualify for the benefits of the special use valuation provisions of section 2032A.

### FINDINGS OF FACT

Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, Floral Emerson and Reba Harris (hereinafter sometimes referred to as Floral and Reba, respectively), co-trustees and coexecutrices of the Estate of Rebecca Ward, resided in Indiana. As of the date of her death, Rebecca Ward (hereinafter sometimes referred to as decedent) resided near Princeton, Indiana.

Decedent was born on April 15, 1885, and died on January 31, 1978.

---

[1]Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the date of decedent's death.

Decedent created an inter vivos trust dated June 10, 1977, and transferred to this trust her farm, consisting of about 118 acres of land located in Gibson County, Indiana (hereinafter sometimes referred to as the Ward farm). Decedent was the grantor and trustee of the trust and had complete control of all of the trust assets. Decedent did not leave a will.

Decedent was born on a farm in Owensville, Indiana, and lived there until she married Silas Ward (hereinafter sometimes referred to as Silas) in 1905. At that time she moved to the Ward farm where she and Silas lived the remainder of their lives.[2] Decedent and Silas had one daughter, Floral, who was born on the Ward farm. Floral married in 1927. In 1932, Floral returned to the farm with her husband to live with her parents. She resided there until decedent's death in 1978. Floral has one daughter, Reba, who was born on the Ward farm in 1937 and lived there until she married in 1961. Reba has one daughter, Rebecca Harris.

The sole source of income of decedent and Silas was their farming operation on the Ward farm. In the 1930's and 1940's, they raised corn, wheat, soybeans, clover, cattle, milk cows, hogs, and chickens. Decedent was actively involved with her husband in the farming operation, performing such tasks as milking cows, feeding livestock, maintaining a garden, participating in crop management, and other tasks associated with farming.

In the 1940's, Milton Barrett (hereinafter sometimes referred to as Barrett) and his father began sharecropping the grain farming portion of the Ward farm. As Silas' health began to fail several years prior to his death, Silas and decedent discontinued stock farming. Silas died on January 23, 1970. On his death, decedent became the sole owner of the Ward farm. After Silas' death, decedent's livelihood continued to be derived from the grain farming operation under an oral sharecropping arrangement with Barrett.[3]

---

[2]The Ward farm was acquired by the Ward family in 1849 when decedent's father-in-law first purchased a portion of the property. The farm house located on the Ward farm has been occupied from 1849 until 1978 by the Ward family.

[3]After decedent's death, the sharecropping arrangement with Barrett was continued by decedent's daughter, Floral.

Under the oral sharecropping arrangement, decedent furnished the land and Barrett furnished the equipment and labor. They shared equally the expenses of seeds, fertilizers, herbicides, and insecticides, as well as the income derived from the grain farming operation, which consisted of the production of corn, soybeans, and wheat. Decedent paid all expenses relating to the liming of the soil and the installation of drainage tile.[4]

By 1982, Barrett farmed 200 acres of his own land and sharecropped an additional 400 acres, including the 118 acres of the Ward farm. The sharecropping method is the primary method of farming around Princeton, Indiana. Few small farms (150 to 200 acres) are able to operate independently because of the cost of modern machinery. For example, a tractor costs about $60,000 and a large combine costs about $75,000 to $80,000. Barrett owns a complete line of farm machinery, including planters, tillers, and cultivators.

Unlike a dairy or livestock farm which is a 365-day per year operation and requires a significant amount of hand labor, a grain farm the size of the Ward farm requires only about 3 weeks of total working days during the year. This includes the time necessary to plow, plant, spray ditches, mow roadsides, and harvest. Almost all the work on a grain farm is done with machinery.[5]

The crops on the Ward farm were rotated on the following basis: 2 years of corn, 1 year of soybeans, and 1 year of wheat followed by soybeans after the wheat was harvested (a double crop). Barrett followed this rotation on all the farms he worked, whether as owner or sharecropper.

In harvesting the corn crop, Barrett picked his half of the crop early when the moisture content of the corn was still high. He dried his portion of the corn with his personal drying equipment at his farm and then stored the corn in his cribs until he determined that the market was best for selling. Decedent did not own drying equipment or storage facilities. Her half of the corn crop was left in the field until

[4]A significant amount of tiling was done in 1971 and in 1976. Decedent made the decision as to whether and when tiling was to be done; she paid for the tiling. Decedent also paid all expenses relating to the upkeep of the farmhouse, buildings, and driveway.

[5]When Silas was still farming the grain operation, he had a team of horses and a small tractor which would pull a 12-inch plow.

she and Barrett determined that the moisture content and market prices were best for harvesting and immediate sale of the crop.[6]

With regard to the wheat and soybean crops, decedent and Barrett discussed when to harvest and whether to immediately sell or store their respective shares. The division of the harvested crops was made by equal truck loads permitting the separate sale of the grain. Each had the prerogative of storing or selling her or his respective shares of the wheat and soybeans as it was harvested. Decedent generally sold her crops immediately after combining, whereas Barrett sometimes stored his portion. Barrett often sold on the futures market; decedent did so a few times.

Decedent observed the farming operation daily from her residence on the Ward farm. She saw Barrett 1 to 2 times per week during 1970-77 and consulted frequently with him concerning production activities. Decedent rode with Floral around the Wade farm, where decedent could see the fields. Decedent walked into the fields near the farmhouse, sometimes as much as one-eighth to one-fourth mile. Decedent and Barrett often consulted at the edges of the fields. She generally did not inspect the fertilizing; she generally did inspect the planting. She and Barrett discussed matters such as the quality of the grain, moisture levels, price, herbicides, and general crop conditions. She subscribed to and read several farm publications and followed the daily market reports.

Decedent was physically and mentally healthy, and was an "outdoors type" person, until she broke her hip and was hospitalized 3 months before she died. She raised chickens until 1975 and maintained a one-fourth-acre garden until the year before she died. She was never away from the farm for vacations or extended periods of time. She was an active member of the local Farm Bureau, attending the business and social meetings.

---

[6]Barrett did not harvest decedent's share of the corn crop until the moisture content had dropped below 18 percent. If the moisture content is above 15½ percent, the grain elevator reduces the price it is willing to pay per bushel. When the moisture content is about 35 percent, it can be identified visually. However, as the moisture level drops, it is necessary to use a mechanical moisture tester to determine the exact level of moisture. Decedent and Barrett worked together in watching the weather, the market prices, and the moisture level in her corn.

Decedent maintained her own books of her farm income and expenses. Each year she and Floral presented these figures to their accountant. The accountant did not advise decedent and Floral about the separate self-employment tax. Decedent's 1974, 1975, 1976, and 1977 tax returns showed her income from the Ward farm as rent income, on Schedule E, in the amounts set forth in table 1.

Table 1

| Year | Amount |
| --- | --- |
| 1974 | $18,885.76 |
| 1975 | 11,256.75 |
| 1976 | 12,564.29 |
| 1977 | 6,348.31 |

On each of these tax returns, self-employment tax liability was neither reported nor paid on decedent's farm income. In or about September 1982, petitioner filed amended income tax returns for decedent and paid the self-employment tax on decedent's farm income.

The value of the Ward farm when valued for use as a farm for farming purposes is $81,947.46.[7] The value of the Ward farm when valued without regard to that restriction is $265,500 (the value determined in the notice of deficiency).

OPINION

Petitioner contends that during the 8-year period ending on the date of decedent's death, there were periods aggregating 5 years or more during which decedent materially participated in the operation of the Ward farm within the meaning of section 2032A(b)(1)(C)(ii) so as to enable her estate to qualify for the benefits of the special use valuation provisions of section 2032A. Respondent contends that decedent's activities with regard to the operation of her farm did not constitute material participation within the meaning of the statute and the applicable regulations.

We agree with petitioner.

[7]The original estate tax return reported a special use value of $118,000. The election of special use valuation by the estate was mechanically proper. At trial, the parties stipulated to the $81,947.46 amount; petitioner claimed an overpayment.

Section 2032A was enacted by section 2003(a) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1856. The Congress concluded that, in some cases, the estate tax impeded the continuation of family farms or other family businesses, because the estate had to value—and pay tax on—the "speculative value" of the farm or business property, rather than the value based on the use to which this property was being put.[8] The Congress believed that "it is desirable to encourage the continued use of property for farming and other small business purposes." H. Rept. 94-1380, at 22 (1976), 1976-3 C.B. (Vol. 3) 735, 756. In effect, the statute permits taxes on qualifying real property to be computed on an income capitalization method of valuation rather than on the basis of its fair market value and thus limits the taxed value of real property where it continues to be used for the favored family business purpose. *Estate of Geiger v. Commissioner*, 80 T.C. 484, 488 (1983).

However, the Congress recognized that it was thereby granting a tax benefit to certain people under certain circumstances that would not be available to the public generally. Accordingly, the Congress hedged about the tax benefit with numerous restrictions including the following: (1) Limits on the benefit's amount, (2) the use to which the property was put by decedent or certain related individuals, (3) the manner of electing the tax benefit, and (4) recapture of the tax benefit if the related individuals end their

---

[8]The report of the Committee on Ways and Means (H. Rept. 94-1380, at 22 (1976), 1976-3 C.B. (Vol. 3) 735, 756) describes the perceived valuation problems that the new section was designed to change as follows:

"Valuation on the basis of highest and best use, rather than actual use, may result in the imposition of substantially higher estate taxes. In some cases, the greater estate tax burden makes continuation of farming, or the closely held business activities, not feasible because the income potential from these activities is insufficient to service extended tax payments or loans obtained to pay the tax. Thus, the heirs may be forced to sell the land for development purposes. Also, where the valuation of land reflects speculation to such a degree that the price of the land does not bear a reasonable relationship to its earning capacity, your committee believes it unreasonable to require that this 'speculative value' be included in an estate with respect to land devoted to farming or closely held businesses."

This Ways and Means Committee report is properly part of the legislative history of the Tax Reform Act of 1976 (even though it is a report on a different bill), having been approved by the conferees on the 1976 Act. S. Rept. 94-1236, H. Rept. 94-1515 (Conf.) at 610 (1976), 1976-3 C.B. (Vol. 3) 808, 960. See *Estate of Sachs v. Commissioner*, 88 T.C. 769, 772 n. 2 (1987).

qualifying use.[9] The limitation involved in the instant case is the one provided by section 2032A(b)(1)(C)(ii)[10] which

---

[9]As the Court of Appeals put it in *Martin v. Commissioner*, 783 F.2d 81, 94 (7th Cir. 1986), affg. 84 T.C. 620 (1985), special use valuation is an "exceptionally favorable tax treatment that the statute provides to those who come within its demanding terms".

[10]Sec. 2032A provides, in relevant part, as follows:

SEC. 2032A. VALUATION OF CERTAIN FARM, ETC., REAL PROPERTY.

(b) QUALIFIED REAL PROPERTY—

(1) IN GENERAL.—For purposes of this section, the term "qualified real property" means real property located in the United States, which was acquired from or passed from the decedent to a qualified heir of the decedent and which, on the date of the decedent's death, was being used for a qualified use by the decedent or a member of the decedent's family, but only if—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(C) during the 8-year period ending on the date of the decedent's death there have been periods aggregating 5 years or more during which—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(ii) there was material participation by the decedent or a member of the decedent's family in the operation of the farm or other business,

\*　　\*　　\*　　\*　　\*　　\*　　\*

(e) DEFINITIONS; SPECIAL RULES.—For purposes of this section—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(6) MATERIAL PARTICIPATION.—Material participation shall be determined in a manner similar to the manner used for purposes of paragraph (1) of section 1402(a) (relating to net earnings from self-employment).

[Sec. 2032A(b)(1) was retroactively amended in 1978 by sec. 702(d)(1) of Pub. L. 95-600, 92 Stat. 2928, for estates of decedents dying after Dec. 31, 1976, by adding the phrase "which was acquired from or passed to a qualified heir of the decedent and", after "real property located in the United States". Sec. 2032A(b)(1) was again amended in 1981 by inserting "by the decedent or a member of the decedent's family" after "qualified use" each place it appears (sec. 421(b)(1) of Pub. L. 97-34, 95 Stat. 306). The latter amendment was also retroactive with respect to estates of decedents dying after Dec. 31, 1976, by sec. 104(b)(4) of Pub. L. 97-448, 96 Stat. 2382.]

Sec. 1402(a)(1) provides as follows:

SEC. 1402. DEFINITIONS.

(a) NET EARNINGS FROM SELF-EMPLOYMENT.—The term "net earnings from self-employment" means the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business, plus his distributive share (whether or not distributed) of income or loss described in section 702(a)(8) from any trade or business carried on by a partnership of which he is a member; except that in computing such gross income and deductions and such distributive share of partnership ordinary income or loss—

(1) there shall be excluded rentals from real estate and from personal property leased with the real estate (including such rentals paid in crop shares) together with the deductions attributable thereto, unless such rentals are received in the course of a trade or business as a real estate dealer; except that the preceding provisions of this paragraph shall not apply to any income derived by the owner or tenant of land if (A) such income is derived under an arrangement, between the owner or tenant and another individual, which provides that such other individual shall produce agricultural or horticultural commodities (including livestock, bees, poultry, and fur-bearing animals and wildlife) on such land, and that there shall be material participation by the owner or tenant (as determined without regard to any activities of an agent of such owner or tenant) in the production or the management of the

requires that decedent have materially participated in the operation of the farm during periods aggregating at least 5 years out of the 8-year period ending on the date of decedent's death.[11]

Section 20.2032A-3, Estate Tax Regs.,[12] interprets the material participation requirement of the statute. Although adopted after the date of decedent's death, this regulation is applicable to decedent's estate. *Estate of Coon v. Commissioner*, 81 T.C. 602, 608 (1983); sec. 7805(b). Section 2032A(e)(6) provides that, "Material participation shall be

production of such agricultural or horticultural commodities, and (B) there is material participation by the owner or tenant (as determined without regard to any activities of an agent of such owner or tenant) with respect to any such agricultural or horticultural commodity.

[11]Petitioner does not contend that Floral, Reba, or any other "member of the decedent's family" (sec. 2032A(b)(1)(C)(ii)) materially participated in the operation of the farm. Respondent concedes that the election of the claimed benefit was mechanically proper and that petitioner would qualify for the benefit but for the material participation requirement. Neither side suggests that the inter vivos trust should have any effect on our analysis.

[12]Sec. 20.2032A-3, Estate Tax Regs., provides in pertinent part as follows:

Sec. 20.2032A-3. Material participation requirements for valuation of certain farm and closely-held business real property.—(a) *In general.* * * * Whether the required material participation occurs is a factual determination, and the types of activities and financial risks which will support such a finding will vary with the mode of ownership of both the property itself and of any business in which it is used. * * *

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

(e) *Required activities*—(1) *In general.* Actual employment of the decedent (or a member of the decedent's family) on a substantially full-time basis (35 hours a week or more) or to any lesser extent necessary personally to manage fully the farm or business in which the real property to be valued under section 2032A is used constitutes material participation. * * * In the absence of this direct involvement in the farm or other business, the activities of either the decedent or family members must meet the standards prescribed in this paragraph and those prescribed in the regulations issued under section 1402(a)(1). * * *

(2) *Factors considered.* No single factor is determinative of the presence of material participation, but physical work and participation in management decisions are the principal factors to be considered. As a minimum, the decedent and/or a family member must regularly advise or consult with the other managing party on the operation of the business. While they need not make all final management decisions alone, the decedent and/or family members must participate in making a substantial number of these decisions. Additionally, production activities on the land should be inspected regularly by the family participant, and funds should be advanced and financial responsibility assumed for a substantial portion of the expense involved in the operation of the farm or other business in which the real property is used. In the case of a farm, the furnishing by the owner or other family members of a substantial portion of the machinery, implements, and livestock used in the production activities is an important factor to consider in finding material participation. With farms, hotels, or apartment buildings, the operation of which qualifies as a trade or business, the participating decedent or heir's maintaining his or her principal place of residence on the premises is a factor to consider in determining whether the overall participation is material. Retention of a professional farm manager will not by itself prevent satisfaction of the material participation requirement by the decedent and family members. However, the decedent and/or a family member must personally materially participate under the terms of arrangement with the professional farm manager to satisfy this requirement.

determined in a manner *similar to* the manner used for purposes of paragraph (1) of section 1402(a) (relating to net earnings from self-employment)".[13]

Whether decedent materially participated in the operation of her farm is an issue of fact. Sec. 20.2032A-3(a), Estate Tax Regs. Petitioner bears the burden of proving error in respondent's determination. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. In determining whether decedent materially participated in the operation of her farm, we do not treat the activities of her agent (Barrett) as the activities of decedent. Secs. 2032A(e)(6) and 1402(a)(1); sec. 20.2032A-3(e)(2), Estate Tax Regs.; sec. 1.1402(a)-4(b)(5), Income Tax Regs.

The relevant time period began on January 31, 1970, and ended on the date of decedent's death. Petitioner must show

---

[13]Sec. 1.1402(a)-4, Income Tax Regs., provides in relevant part as follows:

Sec. 1.1402(a)-4. Rentals from real estate.

\*       \*       \*       \*       \*       \*       \*

(b) *Special rule for "includible farm rental income"—(1) In general.* Notwithstanding the rules set forth in paragraph (a) of this section, there shall be included in determining net earnings from self-employment for taxable years ending after 1955 any income derived by an owner or tenant of land, if the following requirements are met with respect to such income:

(i) The income is derived under an arrangement between the owner or tenant of land and another person which provides that such other person shall produce agricultural or horticultural commodities on such land, and that there shall be material participation by the owner or tenant in the production or the management of the production of such agricultural or horticultural commodities; and

(ii) There is a material participation by the owner or tenant with respect to any such agricultural or horticultural commodity. Income so derived shall be referred to in this section as "includible farm rental income".

\*       \*       \*       \*       \*       \*       \*

(4) *Actual participation.* In order for the rental income received by the owner or tenant of land to be treated as includible farm rental income, not only must it be derived pursuant to the arrangement described in subparagraph (1) of this paragraph, but also the owner or tenant must actually participate to a material degree in the production or in the management of the production of any of the commodities required to be produced under the arrangement, or he must actually participate in both the production and the management of the production to an extent that his participation in the one when combined with his participation in the other will be considered participation to a material degree. If the owner or tenant shows that he periodically advises or consults with the other person, who under the arrangement produces the agricultural or horticultural commodities, as to the production of any of these commodities and also shows that he periodically inspects the production activities on the land, he will have presented strong evidence of the existence of the degree of participation contemplated by section 1402(a)(1). If, in addition to the foregoing, the owner or tenant shows that he furnishes a substantial portion of the machinery, implements, and livestock used in the production of the commodities or that he furnishes or advances funds, or assumes financial responsibility for a substantial part of the expense involved in the production of the commodities, he will have established the existence of the degree of participation contemplated by section 1402(a)(1) and this paragraph.

that decedent materially participated in the operation of the farm during periods aggregating at least 5 years within this relevant time period. Petitioner contends that this material participation occurred continuously throughout the 8-year period until she broke her hip and was hospitalized in October 1977, 3 months before her death.

We proceed to a consideration of decedent's activities during the relevant period in light of the pertinent regulations. The regulations specifically provide that the "types of activities and financial risks which will support [a finding of material participation] will vary with the mode of ownership of both the property itself and of any business in which it is used". Sec. 20.2032A-3(a), Estate Tax Regs. Thus, we must assess decedent's activities with respect to the particular type of farming operation involved.

The farming of decedent's 118-acre farm during the relevant period was an entirely mechanized operation. The crops produced were corn, wheat, and soybeans. Unlike the labor-intensive farming methods used by decedent and Silas up until the 1940s, grain farming has been simplified considerably with the use of modern-day technology and equipment. The use of large, powerful tractors and other equipment has greatly reduced the time necessary to produce grain crops from the time required when farmers used smaller horse-drawn equipment. In fact, only about 3 weeks of work days during a calendar year were necessary to plant and harvest the crops on the Ward farm. See *Estate of Sherrod v. Commissioner*, 82 T.C. 523, 536 (1984), revd. on another issue 774 F.2d 1057 (11th Cir. 1985).

The advent of this expensive mechanized technology has made it uneconomical for farmers to farm their own small acreages. Thus, it was common, around the area where decedent's farm was located, to enter into a sharecropping arrangement with a farmer who owned the necessary modern equipment. The fact that sharecropping was a common local practice does not affect petitioner's obligations to prove decedent's material participation, nor does it affect the definition of material participation. *Estate of Coon v. Commissioner*, 81 T.C. at 610-611.

Decedent lived on the Ward farm from her marriage in 1905 until her death in 1978. She was never employed

outside of the farming operation and her livelihood was derived from the farm.[14] During the relevant period, she continued the oral sharecropping arrangement with her neighbor, Barrett, that had been in effect since the 1940's. Under the sharecropping arrangement, decedent furnished the land and Barrett furnished the equipment and labor. The profits and losses of the farming operation and the expenses of seeds, fertilizers, and chemicals were divided equally. Decedent assumed financial responsibility for the expenses of liming the soil and the installation of drainage tile. She paid all the real estate taxes on the land as well as her share of the farm expenses, regardless of whether she realized a profit on the sale of the crops. Thus, decedent was financially at risk in the farming operation.

Section 20.2032A-3(e)(1), Estate Tax Regs., provides in pertinent part that actual employment of the decedent "on a substantially full-time basis (35 hours a week or more) or to any lesser extent necessary personally to manage fully the farm * * * constitutes material participation." The regulations recognize that many farming operations require only seasonal activity and that little or no actual activity occurs during nonproducing seasons. Because decedent did not actually operate the machinery used to produce the crops on her farm, we look to the applicable factors set forth in section 20.2032A-3(e)(2), Estate Tax Regs.

Subparagraph (2) provides that "the principal factors" are physical work and participation in management decisions. Although decedent did not perform the physical work of operating the machinery she did participate fully in management decisions.

Decedent made her own independent decisions as to the harvesting and marketing of her half of the crops. Because she did not own mechanical drying equipment, she often left her half of the corn crop in the field after Barrett's half had been harvested, until the moisture content had dropped to acceptable levels. Decedent and Barrett discussed when to harvest and sell the wheat and soybean crops. Decedent generally sold her half of the crops immediately after combining, whereas Barrett sometimes stored his portion of

---

[14]We decline respondent's invitation to conclude that decedent's lack of formal education in farming methods somehow undercuts her many decades of practical experience.

the crop or sold it on the futures market. In addition, because she lived on the farm, she was able to, and did, inspect the production activities on a regular basis.

We have carefully compared the facts of the instant case with those in *Estate of Coon v. Commissioner, supra*, in which we held for respondent on this issue. As was the case with Frank J. Coon in *Estate of Coon*, decedent did assume financial responsibility for a substantial portion of the expense involved in the operation of her farm but did not provide any of the machinery used in producing the crops. However, unlike the facts in *Estate of Coon*, decedent lived on the farm premises, inspected the crops on a regular basis, and consulted directly with the tenant rather than employing a go-between to relay messages. Moreover, decedent made decisions regarding the harvesting and selling of her portion of the crops independent of the decisions made by Barrett with regard to his half of the crops.

We also note that the Congress tied the material participation requirements into standards similar to those applicable to the self-employment tax. Although decedent's estate now claims that decedent materially participated in the farm operations in these years, and although decedent reported income from these operations for each of these years, decedent did not initially pay self-employment taxes for any of these years.

Giving appropriate weight to all of the foregoing factors, some of which favor respondent but most of which favor decedent, we conclude that decedent materially participated in the operation of the Ward farm within the meaning of section 2032A(b)(1)(C)(ii) and the relevant regulations.[15] Thus, the instant case falls on the other side of the line from *Estate of Coon*.

We hold for petitioner.

To take account of petitioner's concession as to the inclusion in the estate of an additional sum relating to a certificate of deposit and the overpayment claimed by petitioner (see note 7 *supra*),

*Decision will be entered under Rule 155.*

---

[15]See sec. 20.2032A-3(g), Examples (1), (2), and (7), Estate Tax Regs.