ESTATE OF KENNETH R. MAPES, DECEASED, DYANNE K. MILLER AND DONALD R. MAPES, CO-EXECUTORS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1038-89.                Filed October 29, 1992.

*Stanley L. Tucker* and *Thomas F. Hartzell,* for petitioner.
*Richard A. Stone,* for respondent.

WHALEN, *Judge:* Respondent determined a deficiency of $106,470.41 in petitioner's Federal estate tax. We are called upon to decide two issues. The first is whether petitioner is entitled to elect the special use valuation of farm property provided by section 2032A. Unless stated otherwise, all section references are to the Internal Revenue Code in effect on the date of the decedent's death. This issue turns on whether the decedent's farm property satisfies the 50-percent test of section 2032A(b)(1)(A) for qualified real property. The second issue for decision is whether petitioner made a valid election under section 2032 to use the alternate valuation method.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact filed by the parties and the exhibits attached thereto are incorporated herein by this reference.

Mr. Kenneth R. Mapes died on February 6, 1985. He was approximately 75 years of age and was a resident of Carthage, Illinois, at the time of his death. Letters testamentary were issued by the Circuit Court, Ninth Judicial District, Carthage, Illinois, to his daughter, Ms. Dyanne K. Miller, and to his son, Mr. Donald R. Mapes, as coexecutors.

The subject estate tax return states, as of the time the return was filed, that Ms. Miller's address was 808 Wabash, Carthage, Illinois 62321, and Mr. Donald R. Mapes' address was 451 Lambourne Avenue, Worthington, Ohio 43085. The stipulation of facts filed by the parties states as follows:

The petitioner is the Estate of Kenneth R. Mapes, Deceased, Dyanne K. Miller and Donald R. Mapes, Co-Executors, whose legal address at the time the petition in this case was filed was 608 Wabash Street, Carthage, Illinois 62321.

The record in this case does not otherwise disclose the legal residence of either of the coexecutors at the time the petition in this case was filed.

Before he died, the decedent was a farmer. He owned three tracts of farmland in Hancock County, Illinois, on the date of his death. Tract 1 consisted of 124 acres of well-managed prairie soil and was improved with an old double crib and a machine storage shed. Tract 2 consisted of 120 acres of well-managed prairie soil and was improved with a six-room frame dwelling, a horse barn, and a double crib. Tract 3 consisted of only 1 acre.

From at least 1981, the decedent leased tracts 1 and 2 to a tenant farmer under a share rental arrangement. The decedent paid 50 percent of all direct crop expenses, plus certain other expenses, such as real estate taxes, building insurance, and capital repairs. The tenant supplied farming equipment and machinery, and he grew corn and soybeans on the decedent's land. The decedent and the tenant divided the harvested crop equally.

The decedent's usual practice was to delay the sale of his share of the harvested crop until the spring of the following year. On the date of his death, the decedent owned grain in

storage worth $30,719.41, consisting of 6,000 bushels of corn worth $16,044.41 and 2,500 bushels of beans worth $14,675. All of the decedent's grain in storage had been grown during the prior year, 1984.

On their joint Federal income tax returns for 1981 through 1984, the decedent and his wife reported the following income and expenses from the 50-percent share rental arrangement described above:

| Year | Rental income | Depreciation | Other deductions | Net profit |
|------|---------------|--------------|------------------|------------|
| 1981 | $42,147.28 | $1,219.53 | $13,466.27 | $27,461.48 |
| 1982 | 41,613.00 | 1,655.97 | 12,836.09 | 27,120.94 |
| 1983 | 38,022.02 | 1,609.34 | 13,000.52 | [1]23,412.16 |
| 1984 | 39,585.00 | 1,609.00 | 13,380.00 | 24,596.00 |

[1]Due to a mathematical error, the decedent's 1983 return incorrectly reports total deductions of $29,010 and a net profit of $9,012.

The decedent's cash operating expenses per crop acre were consistent with those of similar central Illinois farms operated on a share rental basis during the same period.

From the beginning of 1982 through the date of his death on February 6, 1985, the decedent paid both farm expenses and general living expenses from a single checking account at Farmers State Bank. On the date of the decedent's death, the balance of the funds in this account was $92,694.35. The decedent deposited investment interest and crop proceeds into the account and interest was credited to this account in the following amounts:

| Period | Interest income deposited | Crop proceeds deposited | Interest credited |
|--------|---------------------------|-------------------------|-------------------|
| 1982 | $67,621.14 | $37,603.25 | - - - |
| 1983 | 47,676.53 | 38,012.27 | $4,208.80 |
| 1984 | 55,184.66 | 39,585.43 | 6,428.77 |
| Jan. 1985 | 8,687.17 | - - - | 680.12 |
| Total | 179,169.50 | 115,200.95 | 11,317.69 |

Certificates of deposit were purchased with funds from this account in the amounts of $40,000 in 1982, $85,519.16 in 1983, and $50,000 in 1984, a total of $175,519.16.

The coexecutors of the decedent's estate filed a timely return on IRS Form 706, U.S. Estate (and Generation-Skipping Transfer) Tax Return. Schedule A of that return, dealing with real estate, lists the three tracts of farmland owned

by the decedent when he died. In summary, that schedule reports the following:

### Tract 1

| | | |
|---|---:|---:|
| Fair market value | $261,000 | |
| Real estate taxes | (3,658) | |
| | 257,342 | |
| Special use value | 123,891 | |
| Special use value as adjusted for liens | | $120,233 |

### Tract 2

| | | |
|---|---:|---:|
| Fair market value | 256,000 | |
| Real estate taxes | (4,836) | |
| | 251,164 | |
| Special use value | 126,820 | |
| Special use value as adjusted for liens | | 121,984 |

### Tract 3

| | | |
|---|---:|---:|
| Fair market value | 1,000 | |
| Real estate taxes | (40) | 960 |
| Total real property | | 243,177 |

The fair market value reported on Schedule A for each tract is substantiated by a document attached to the return entitled "Real Estate Appraisal". In that document, an appraiser, Mr. R.L. Cunningham, states that, on the date of the decedent's death, the fair market value of tract 1 was $261,000, the fair market value of tract 2 was $256,000, and the fair market value of tract 3 was $1,000.

The special use value of tracts 1 and 2, as reported on Schedule A, is substantiated by another document attached to the return entitled "Appraisal of Farm Real Estate Under I.R.S. 2032A(e)(7)". In that document, Mr. Cunningham states that, on the date of the decedent's death, the value of the decedent's farmland, determined in accordance with the method of valuing farms prescribed by section 2032A(e)(7), is $123,890.88 in the case of tract 1 and $126,819.60 in the case of tract 2. Parenthetically, we note that the parties now agree that the aggregate special use value of tracts 1 and 2 is $250,711, i.e., $123,891 in the case of tract 1, and $126,820 in the case of tract 2.

There is also attached to the subject estate tax return a document entitled "Election of Special Use Valuation as Authorized by Section 2032A of the Internal Revenue Code" in which the coexecutors seek to elect the special use value with respect to tracts 1 and 2. That document, which we refer to herein as the "section 2032A election", states that "the adjusted value of all real property to be specially valued is $242,177.00". The record does not explain why the aggregate special use value of tracts 1 and 2, as set out on Schedule A, $242,217, is $40 more than the amount of the property to be specially valued, as set out in the section 2032A election, $242,177. Finally, there is attached to the subject estate tax return a document entitled "Agreement to Special Valuation under section 2032A" which was executed by the decedent's son and daughter.

The section 2032A election states that the following items of personal property "are in a qualified use":

| Ref., estate tax return | Description | Value |
|---|---|---|
| Schedule B | Stocks and bonds | $405.00 |
| Schedule C, item 3 | Farm checking account in Farmers State Bank | 92,694.35 |
| Schedule F, item 1 | 6,000 bu corn, 2.67/bu | 16,044.41 |
| Item 2 | 2,500 bu beans, 5.78 [sic]/bu | 14,675.00 |
| Total | | 123,818.76 |

Page 2 of the subject estate tax return sets forth certain "Elections by the Executor". Line 1 of that section of the return asks, "Do you elect alternate valuation?" In response, the subject return states, "(see protective alternate valuation election attached)". There is attached to the return a document which states as follows:

PROTECTIVE ALTERNATE VALUATION ELECTION

In the event, and only in the event, the Special Use Valuation herein elected is for any reason disapproved, then as to the assets of the estate the Executors elect valuation by the alternative valuation method.

Attached hereto as Exhibit "B" are appraisals [sic] for said alternative valuation.

/s/_____
Dyanne K. Miller, Executor

In the appraisal referred to above as "Exhibit 'B'", the appraiser, Mr. Cunningham, states that as of August 6, 1985, 6 months after the date of death, the fair market value of tract 1 was $208,320, the fair market value of tract 2 was $204,800, and the fair market value of tract 3 was $1,000, a total of $414,120.

In the notice of deficiency issued to petitioner, respondent determined that petitioner is not eligible to elect the special use valuation because "the requirements set forth in section 2032A(b)(1)(A) have not been met." Accordingly, respondent increased the value of both tract 1 and 2, as reported on the decedent's return, to the fair market value of each tract at the decedent's death, $261,000 and $256,000, respectively. Respondent also determined that petitioner's "Protective Alternate Valuation Election does not meet the provisions of section 2032."

OPINION

1. *Petitioner's Eligibility To Elect the Special Use Value Under Section 2032A*

Generally, a decedent's gross estate includes the fair market value of the decedent's interest in every asset in which the decedent owned an interest at the time of his or her death. Secs. 2031(a), 2033. However, in the case of certain real property which was used by the decedent or a member of his family for farming or in another closely held business, section 2032A allows the decedent's personal representative to elect to value the real property on the basis of that property's value as a farm or in the closely held business, rather than its fair market value determined on the basis of its highest and best use. *Estate of Gunland v. Commissioner,* 88 T.C. 1453, 1454 (1987); sec. 20.2032A-3(a), Estate Tax Regs. The purpose of this provision is to lessen the estate tax burden and to alleviate the liquidity problems faced by the surviving family of a person who dies owning real property used as a farm or in a closely held business. H. Rept. 94-1380, at 21-22 (1976), 1976-3 C.B. (Vol. 3) 735, 755-756; S. Rept. 94-938 (Part 2), at 15 (1976), 1976-3 C.B. (Vol. 3) 643, 657. The provision is intended to allow the family to continue the farm or other business, rather than being forced to sell

the land to pay estate taxes. H. Rept. 94-1380, *supra* at 21-22, 1976-3 C.B. (Vol. 3) at 755-756; S. Rept. 94-938 (Part 2), *supra* at 15, 1976-3 C.B. (Vol. 3) at 657.

In this case, the subject estate tax return states that, as of the date of death, the fair market value of the two large tracts of land owned by the decedent and the special value of each tract, based on its use for farm purposes, are as follows:

| Property | Fair market value | Special value farm use | Difference |
|----------|-------------------|------------------------|------------|
| Tract 1 | $261,000 | $120,233 | $140,767 |
| Tract 2 | 256,000 | 121,984 | 134,016 |
| Total | 517,000 | 242,217 | 274,783 |

For estate tax purposes, the coexecutors sought to value the above property based upon its use for farming purposes, under section 2032A, and they included in the decedent's gross estate the above special value, $242,217, as the aggregate value of tracts 1 and 2.

In the notice of deficiency issued to petitioner, respondent determined that petitioner is not eligible to elect to value the property under section 2032A and that the aggregate fair market value of the subject property, $517,000, should have been included in the gross estate. Therefore, respondent increased the decedent's gross estate by $274,783. The notice of deficiency states that petitioner is not entitled to elect the special use value because "the requirements set forth in section 2032A(b)(1)(A) have not been met."

The provision cited by respondent in the notice of deficiency, section 2032A(b)(1)(A), forms a part of the definition of "qualified real property". It states as follows:

(1) IN GENERAL.—For purposes of this section, the term "qualified real property" means real property located in the United States which was acquired from or passed from the decedent to a qualified heir of the decedent and which, on the date of the decedent's death, was being used for a qualified use by the decedent or a member of the decedent's family, but only if—

(A) 50 percent or more of the adjusted value of the gross estate consists of the adjusted value of real or personal property which—

(i) on the date of the decedent's death, was being used for a qualified use by the decedent or a member of the decedent's family, and

(ii) was acquired from or passed from the decedent to a qualified heir of the decedent.

The phrase "qualified use", as used above, is defined by section 2032A(b)(2) to mean the following:

(2) QUALIFIED USE.—For purposes of this section, the term "qualified use" means the devotion of the property to any of the following:
(A) use as a farm for farming purposes, or
(B) use in a trade or business other than the trade or business of farming.

Thus, in effect, respondent determined in the notice of deficiency that the "adjusted value of real or personal property" which was being used on the date of death in the decedent's farming business did not amount to 50 percent or more of "the adjusted value of the gross estate".

The aggregate fair market value of the assets included in the decedent's gross estate is $1,244,099.45. Fifty percent of that amount is $622,049.73. The parties do not fully agree on which of the assets, included in the decedent's gross estate, was used on the date of the decedent's death "as a farm for farming purposes". See sec. 2032A(b)(2). The following schedule lists the assets which comprise the decedent's gross estate (valued as of the date of death), the assets which, petitioner claims, were used for farming purposes, and the assets which, respondent concedes, were used for farming purposes:

| Assets | Gross estate | Farm assets / petitioner | Farm assets / respondent |
|---|---|---|---|
| Tract 1 | $261,000.00 | $261,000.00 | $261,000.00 |
| Tract 2 | 256,000.00 | 256,000.00 | 256,000.00 |
| Tract 3 | 1,000.00 | 1,000.00 | 1,000.00 |
| Preferred stock | 405.00 | 405.00 | 405.00 |
| Grain in storage | 30,719.41 | 30,719.41 | 30,719.41 |
| Checking account | 92,694.35 | 92,694.35 | - - - |
| Other assets | 602,280.69 | - - - | - - - |
| Total | 1,244,099.45 | 641,818.76 | 549,124.41 |
| Percent of gross estate | | 51.5890% | 44.1383% |

It is evident from the above that the principal difference between the parties is the treatment of the funds in the decedent's checking account, $92,694.35. Petitioner treats the entire balance in the checking account as property used for farming purposes and, on that basis, argues that the decedent devoted $641,818.76, or 51.5890 percent of the assets included in his gross estate, to "use as a farm for

farming purposes". Sec. 2032A(b)(2)(A). Respondent, on the other hand, does not concede that any of the funds in the decedent's checking account can be treated as having been "used for a qualified use" within the meaning of section 2032A(b)(1).

Therefore, the issue whether tracts 1 and 2 are qualified real property, within the meaning of section 2032A(b), turns on whether the funds in the decedent's bank account are taken into consideration under the 50-percent test of section 2032A(b)(1)(A). We must decide whether those funds constitute "personal property which * * * was being used for a qualified use" on the date of the decedent's death. For this purpose, the term "qualified use" means "the devotion of the property to * * * use as a farm for farming purposes". Sec. 2032A(b)(2)(A). The term "farm" is defined by section 2032A(e)(4) as follows:

The term "farm" includes stock, dairy, poultry, fruit, furbearing animal, and truck farms, plantations, ranches, nurseries, ranges, greenhouses or other similar structures used primarily for the raising of agricultural or horticultural commodities, and orchards and woodlands.

The term "farming purposes" is defined by section 2032A(e)(5) as follows:

(5) FARMING PURPOSES.—The term "farming purposes" means—
    (A) cultivating the soil or raising or harvesting any agricultural or horticultural commodity (including the raising, shearing, feeding, caring for, training, and management of animals) on a farm;
    (B) handling, drying, packing, grading, or storing on a farm any agricultural or horticultural commodity in its unmanufactured state, but only if the owner, tenant, or operator of the farm regularly produces more than one-half of the commodity so treated; and
    (C)(i) the planting, cultivating, caring for, or cutting of trees, or
        (ii) the preparation (other than milling) of trees for market.

The parties to this case both agree that cash on deposit, such as the funds in the decedent's bank account, can be taken into account as property used for farming purposes under the 50-percent test in section 2032A(b)(1)(A). They both cite a Treasury regulation which had been promulgated under a former provision of the Internal Revenue Code, section 6166A. See sec. 20.6166A-2, Estate Tax Regs. Before its repeal in 1981 with respect to the estates of decedents dying after December 31, 1981, section 6166A had permitted an

executor to elect to extend the time for paying the estate tax attributable to the value of an interest in a closely held business. Technical Amendments Act of 1958, Pub. L. 85-866, sec. 206(a), 72 Stat. 1606, 1681. Section 20.6166A-2(c)(2), Estate Tax Regs., provided as follows regarding what assets could be taken into account under section 6166A:

(2) In the case of a trade or business carried on as a proprietorship, the interest in the closely held business includes only those assets of the decedent which were actually utilized by him in the trade or business. * * * Whether an asset will be considered as used in the trade or business will depend on the facts and circumstances of the particular case. For example, if a bank account was held by the decedent in his individual' name (as distinguished from the trade or business name) and it can be clearly shown that the amount on deposit represents working capital of the business as well as nonbusiness funds (e.g., receipts from investments, such as dividends and interest), then that part of the amount on deposit which represents working capital of the business will constitute a part of the interest in the closely held business. On the other hand, if a bank account is held by the decedent in the trade or business name and it can be shown that the amount represents nonbusiness funds as well as working capital, then only that part of the amount on deposit which represents working capital of the business will constitute a part of the interest in the closely held business. * * *

We note that former section 6166A is similar to section 6166 of the current Code, under which an executor can also elect to extend the time for paying the portion of the estate tax attributable to a closely held business. See also section 2032A(g), which makes specific reference to section 6166(b)(1).

The parties to this case disagree about the amount of the decedent's cash which can be taken into account for purposes of section 2032A(b)(1)(A)(i) as property used as a farm for farm purposes. Petitioner asserts that this issue raises "both a question of fact and a question of law". As to the legal question, petitioner urges the Court to adopt a "broad view" concerning the amount of "working capital" which will be treated as "property used by the decedent for farming purposes". Under this view, petitioner urges the Court to adopt "a working capital theory * * * which produces the most income for the family farm." Petitioner distinguishes this from a "narrow view" under which petitioner would be limited to that "portion of the working capital fund * * * actually used by the decedent in the farming operation."

Petitioner argues that, after the Court adopts the above "broad view", it must decide what portion of the decedent's bank account can be taken into consideration under section 2032A(b)(1)(A). This is the question of fact to which petitioner refers. Petitioner makes alternative arguments. First, it argues that "the entire [bank] account qualifies as being devoted to farming." Petitioner points out that the decedent's crop proceeds were deposited into the account and that the farm expenses were paid from there. Petitioner attempts to minimize the nonfarm use of the account by noting that the investment interest, which was deposited into the account, was almost entirely offset by purchases of certificates of deposit, with the result that it had no meaningful net effect on the account balance.

Alternatively, petitioner argues that $85,924 to $90,924 of the subject account should be taken into consideration under section 2032A(b)(1)(A) as working capital. In support of this argument, petitioner relies upon the expert testimony and report of Mr. Steven L. Hofing, a management consultant with a background in agricultural economics and finance. In line with petitioner's "broad view", Mr. Hofing premised his analysis of the working capital needed to operate the decedent's farm on a rental arrangement known as "custom farming". Mr. Hofing did not analyze the working capital needed to operate the decedent's farm under the 50-percent share rental arrangement which the decedent had used for a number of years prior to his death.

Under custom farming, a landowner hires a custom operator to plant, maintain, and harvest the crop in return for a set fee per acre. The landowner pays all direct expenses, but receives all of the profit. Mr. Hofing's report states that custom farming is the alternative with the highest potential return for the landowner, but, he acknowledges, it "requires substantially more working capital than a share rental arrangement".

Mr. Hofing concludes that if the decedent's farm were operated under a custom farming arrangement, the average actual expenses incurred by the decedent, $14,737.50, would have to be increased by additional operating expenses of $8,961.75, and by a custom farming charge of $16,762.50, to arrive at "the total estimated costs associated with a custom farming operation on the Mapes' farm in the aggregate

amount of $40,461.75". Mr. Hofing also concludes that a conservative working capital reserve would include an additional year's worth of operating expenses to permit the farm owner to withstand a total crop failure and still be able to cover expenses for the next crop year. Furthermore, Mr. Hofing would add a reserve of $5,000 to $10,000 for capital expenditures which could include "tilling improvements and repairs, conservation expenditures, and building repair and replacement". Finally, Mr. Hofing notes the fact that the decedent did not carry property and casualty insurance on the farm buildings, but chose to self-insure against such risks. Mr. Hofing did not estimate a reserve for self-insurance but suggested that one should be maintained.

Thus, according to Mr. Hofing, a reasonable working capital reserve, assuming that the decedent's farm were operated under a custom farming rental arrangement, would fall within the following range:

| | | |
|---|---|---|
| Reserve for expense/income timing differences | $40,462 | $40,462 |
| Reserve for operating losses | 40,462 | 40,462 |
| Reserve for capital expenditures ($5,000 to $10,000) | 5,000 | 10,000 |
| Reserve for self-insurance | -0- | -0- |
| Total | 85,924 | 90,924 |

Petitioner makes a third argument. It argues that the decedent's farm "is not an economic unit" at its present size of 244 acres. According to petitioner, the size of the farm must be increased by the addition of 156 acres to 556 acres, at a cost ranging from $331,000 to $1,197,000, in order to become a "viable economic size." In accordance with its broad view, petitioner argues that "adequate cash for expansion to a viable economic size should be included as special use property without any specific showing of intent by the deceased to expand the farm."

We do not accept petitioner's "broad view" of section 2032A. Our reading of section 2032A suggests that the 50-percent test is to be applied on the basis of the actual operation of a decedent's farm on the date of death. Section 2032A(b)(1)(A)(i) refers to property which "on the date of the decedent's death, was being used for a qualified use". We interpret this language to mean that only those assets which were actually being used for farm purposes by the decedent

or a member of the decedent's family can be included in the numerator of the fraction prescribed under the 50-percent test. This language does not permit the inclusion of the value of assets which were owned by the decedent but which were not actually employed in a qualifying use at the time of his death. *Estate of Sherrod v. Commissioner,* 774 F.2d 1057 (11th Cir. 1985), revg. 82 T.C. 523 (1984); *Estate of Geiger v. Commissioner,* 80 T.C. 484 (1983). A fortiori, this language does not permit the inclusion of the purchase price of new assets which might have been purchased by the decedent to make the farm or business more profitable.

Turning to petitioner's first argument, we disagree that all of the funds in the decedent's bank account were being used for a qualified use on the date of the decedent's death and, therefore, can be included in the numerator of the fraction under the 50-percent test. Petitioner acknowledges that the account was used, at least in part, for personal and investment purposes. Nevertheless, petitioner argues, based upon its view of section 2032A, that the decedent's entire bank account balance is to be taken into account under the 50-percent test.

Petitioner's argument overlooks the fact that the 50-percent test in section 2032A(b)(1)(A) is intended to confine the benefits of special use valuation to those estates that would "in fact be likely to experience a genuine liquidity problem because a major part of the estate's assets is tied up in a farm or other closely-held family business." *Estate of Sherrod v. Commissioner,* 774 F.2d 1057, 1063 (11th Cir. 1985), revg. on other grounds 82 T.C. 523 (1984); see *Estate of Geiger v. Commissioner, supra* at 489. Petitioner's argument would permit excess cash in a bank account to artificially inflate the value of the assets used for a "qualified use" within the meaning of section 2032A(b)(1)(A)(i). It would lead to the incongruous result that estates with excess cash in a bank account would be more likely, than estates without such excess cash, to meet the 50-percent test and qualify for the special use valuation treatment which was designed in part to redress illiquidity.

We also disagree with petitioner's second argument that the decedent's farm needed between $85,924 and $90,924 of working capital at the time of his death. In support of that factual argument, petitioner relies on the expert testimony of

Mr. Hofing, who, as mentioned above, analyzed the cash needed to operate the decedent's farm under a custom farming arrangement. Petitioner concedes that the decedent never used custom farming, but operated his farm under a 50-percent share rental arrangement. Nevertheless, petitioner argues that the Court should accept Mr. Hofing's custom farming analysis because the Court should adopt "a working capital theory best designed to preserve the family farm which is that theory which produces the most income for the family farm." In effect, petitioner asks the Court to countenance a hypothetical highest and best farm use for purposes of the 50-percent test. Petitioner cites no specific authority for that position but relies upon its "broad view" of section 2032A.

While we agree that, in enacting section 2032A, Congress intended to aid the perpetuation of family farms, it is clear that Congress imposed various limitations to eligibility for the benefits of section 2032A, including the 50-percent test of section 2032A(b)(1)(A)(i). We do not accept the proposition, implicit in petitioner's argument, that Congress intended the plain words of the 50-percent limitation to be distorted or overridden by this general intent. See *Estate of Geiger v. Commissioner, supra* at 488.

At trial, petitioner's expert, Mr. Hofing, was asked to state the amount of working capital needed to operate the decedent's farm under the 50-percent share rental arrangement which the decedent used. Mr. Hofing agreed that it would be lower than the amount needed under a custom farming arrangement, but he could not state what the amount would be. He agreed that the first layer or component of his analysis, the reserve for expense/income timing differences, would be reduced to $14,737.50. He also agreed that the third layer of his analysis, the reserve for capital expenditures, would be the same, $5,000 to $10,000. Mr. Hofing could not state the amount of the second layer of his analysis, the reserve for operating losses, that is, the amount of "working capital to withstand operating losses that may occur from time to time."

It appears from Mr. Hofing's testimony that the reserve for operating losses would fall within the range from $14,737, i.e., an additional year's worth of operating expenses, to $40,462, i.e., the amount which Mr. Hofing used in his cus-

tom farming analysis. Therefore, if we accept the methodology used by Mr. Hofing in his custom farming report, but change the amounts to reflect his testimony about the 50-percent share rental arrangement, Mr. Hofing's analysis produces the following range of working capital needed to operate the decedent's farm:

| | | |
|---|---|---|
| Reserve for expense/income timing differences | $14,737 | $14,737 |
| Reserve for operating losses | 14,737 | 40,462 |
| Reserve for capital expenditures ($5,000 to $10,000) | 5,000 | 10,000 |
| Reserve for self-insurance | -0- | -0- |
| Total | 34,474 | 65,199 |

It is apparent, therefore, that, even accepting Mr. Hofing's methodology, petitioner failed to prove its contention that $85,924 to $90,924 of the decedent's bank account constituted working capital for his farm. To the contrary, Mr. Hofing's testimony leads to the conclusion that the maximum working capital needed to operate the decedent's farm at the time of his death was $65,199.

Based upon Mr. Hofing's testimony, the adjusted value of the real or personal property which, on the date of the decedent's death, was being used as a farm for farming purposes did not exceed $614,323.41 or 49.3790 percent of the adjusted value of the gross estate, computed as follows:

| Assets | Gross estate | Farm assets |
|---|---|---|
| Tract 1 | $261,000.00 | $261,000.00 |
| Tract 2 | 256,000.00 | 256,000.00 |
| Tract 3 | 1,000.00 | 1,000.00 |
| Preferred stock | 405.00 | 405.00 |
| Grain in storage | 30,719.41 | 30,719.41 |
| Checking account | 92,694.35 | 65,199.00 |
| Other assets | 602,280.69 | -0- |
| Total | 1,244,099.45 | 614,323.41 |
| Percent of gross estate | | 49.3790% |

We have other difficulties with Mr. Hofing's analysis. For example, we are not convinced that the "volatility" of the farm business in Hancock County, Illinois, makes it "perfectly reasonable for an additional year's worth of operating expense to be included in that working capital reserve". Mr. Hofing's general testimony on that point was contradicted by respondent's expert, Professor Delmar Wilkin of the Univer-

sity of Illinois, who testified on the basis of the annual statistics of crop yields published by the Illinois Crop Reporting Service, a branch of the U.S. Department of Agriculture. According to Professor Wilkin, the figures reported during the 10-year period, 1980 through 1989, for Hancock County, Illinois, show that the lowest corn crop yield took place in 1983 and was 54 percent of the 10-year average. Similarly, the lowest soybean crop yield took place in 1988 and was 77 percent of the 10-year average. These figures hardly suggest the need for a reserve based upon "almost total crop failures". Suffice it to say that we do not credit the testimony of petitioner's expert, Mr. Hofing. We believe that the working capital needed to operate decedent's farm at the time of his death is closer to the level determined by respondent's expert, $13,000, that is, well below the amount needed to satisfy the 50-percent test of section 2032A(b)(1)(A).

Finally, we reject petitioner's argument that cash in the amount of $330,000 to $1.2 million was needed to expand the decedent's farmland to a "viable economic size [and] should be included as special use property without any specific showing of intent by the deceased to expand the farm." As the predicate for this argument, petitioner seizes upon the testimony of respondent's expert, Professor Delmar Wilkin, who stated on cross-examination that he did not view the Mapes farm as an "economic unit". He then agreed with petitioner's counsel who asked: "So in order to preserve this farm as a family farm that could be operated on a self-operating basis, it would require additional farm ground to be either rented of [sic] purchased?"

We note that before putting the last question to Professor Wilkin, petitioner's counsel had distinguished between "a self-operation situation" and "a rental arrangement". Thus, when Professor Wilkin agreed that additional farmland would have to be acquired to put the decedent's farm "on a self-operating basis," it is clear that he was speaking of a different method of operating the farm than the 50-percent share rental arrangement which the decedent used at the time of his death.

Accordingly, petitioner's third argument, like petitioner's second argument, boils down to a hypothetical method of operating the decedent's farm, i.e., "self-operating", and our response is the same as our response to petitioner's second

argument which was premised on a hypothetical method, i.e., custom farming. The statute prescribes that the numerator of the fraction contemplated by the 50-percent test is to include the value of the real or personal property which "on the date of the decedent's death, was being used for a qualified use". Sec. 2032A(b)(1)A)(i). This language does not authorize us to take assets into account which could have been acquired to operate the decedent's farm under a different method than that used by the decedent. The 50-percent test applies to those assets which were "being used" on the date of the decedent's death as a farm for farming purposes. See sec. 2032A(b)(1)(A)(i) and (2)(A).

The incongruity which would result from petitioner's position is obvious. It would permit a small amount of farm property to be treated as a major asset in a decedent's estate on the theory that more farm acreage must be acquired to bring the farm up to economic unit size.

Based upon the above discussion, we reject petitioner's contentions and we find that petitioner has failed to prove that the decedent's farm assets met the 50-percent test set out in section 2032A(b)(1)(A).

## 2. *Whether Petitioner Made a Valid Election Under Section 2032 of the Alternate Valuation Method*

Section 2032(a) and the regulations promulgated thereunder provide a method which can be used to value the gross estate as of the date 6 months after the decedent's death. See sec. 20.2032-1(a), Estate Tax Regs. The executor is required to elect this so-called alternate valuation method. Sec. 2032(a), (d). Section 2032(d) describes the election as follows:

(1) IN GENERAL.—The election provided for in this section shall be made by the executor on the return of the tax imposed by this chapter. Such election, once made, shall be irrevocable.

(2) EXCEPTION.—No election may be made under this section if such return is filed more than 1 year after the time prescribed by law (including extensions) for filing such return.

The regulations provide as follows:

(1) Time and manner of making election. For decedents dying after July 18, 1984, the election * * * shall be made on the estate tax return required to be filed under section 6018(a). However, no election shall be allowed unless made on a return filed within one year of the due date

(including extensions) of such return. Once a return that fails to make the election is filed, this election may not be made on a subsequent return unless the subsequent return is filed by the due date (including extensions) of the original return. [Sec. 5h.4(b), Temporary Regs., 49 Fed. Reg. 35489 (Sept. 10, 1984).]

On the date of the decedent's death, the fair market value of tracts 1 and 2 was $517,000, and the special use value of those properties was $250,711. By 6 months after the decedent's death, August 6, 1985, the fair market value of tracts 1 and 2 had decreased to $413,120. The record does not reveal the special use value of tracts 1 and 2 on August 6, 1985, nor does the record reveal the fair market value of the decedent's other assets on August 6, 1985.

It is evident that the coexecutors used date of death values in reporting the decedent's gross estate. They elected to use the special use value of tracts 1 and 2 determined under section 2032A(e)(7) as of the date of death, $250,711, and they reported the fair market value of each of the remaining assets as of the date of death, as required by section 2031(a).

It is also evident that the coexecutors wanted to preserve their right to elect the alternative valuation method under section 2032, in the event that the special valuation method was not available to the estate. Accordingly, as a fallback position, they filed a "Protective Alternate Valuation Election" in which they stated their intention to elect the alternate valuation method under section 2032 "In the event, and only in the event, the Special Use Valuation herein elected is for any reason disapproved". In line with the protective election, the coexecutors also filed a real estate appraisal in which the decedent's farmland was valued at $414,120, as of August 6, 1985, 6 months after the date of death.

We note that the coexecutors could have chosen to elect both the special use value under section 2032A for tracts 1 and 2 and the alternate valuation method under section 2032. See Rev. Rul. 88-89, 1988-2 C.B. 333; Rev. Rul. 83-31, 1983-1 C.B. 225. In the case of such a dual election, the special use value of the farm or other business property must be determined as of the alternate valuation date under section 2032. Rev. Rul. 88-89, *supra*. The record in this case does not reveal the special use value of the decedent's farmland on August 6, 1985, the alternate valuation date, and we do not know why a dual election was not made. In any event, the

question presented here is whether petitioner is entitled to make a "protective" election under section 2032, that is, an election to use the alternate valuation method which becomes effective upon the denial of petitioner's election of the special use valuation for tracts 1 and 2 under section 2032A.

Respondent contends that petitioner's protective election was faulty for essentially three reasons: First, petitioner's "use of the date of death value on the estate tax return constitutes an election against alternative valuation" and is contrary to the requirement that an election under section 2032 is to be "irrevocable". Second, there is no statutory or other authority which permits a "protective" election to be made under section 2032. Third, petitioner's protective election would allow it to "indefinitely postpone making a decision on the applicable valuation date." We consider each of these points below. We are not persuaded by any of them that petitioner's protective election under section 2032 is improper.

Respondent's first contention is as follows:

> The respondent contends that the use of the date of death value on the estate tax return constitutes an election against alternative valuation. The statute calls for an affirmative election. Since the return utilized dated [sic] of death values, an election was made. The election having been made, no subsequent return having been filed, the election is irrevocable. I.R.C. §2032(d); Temp. Treas. Reg. §5h.4(b)(1).

We do not agree that the use of date of death values on the decedent's return constituted an election. To the contrary, section 2031 requires the decedent's gross estate to be valued as of the date of death. That general rule applies, unless the decedent's personal representative makes an affirmative election to use the different time for valuing the gross estate prescribed by section 2032. Moreover, in this case, petitioner's use of date of death values is compatible with its position that those values should be used in computing the decedent's estate tax, unless petitioner is not eligible to use the special use values of tracts 1 and 2. This is not a case in which the taxpayer made an unconditional election between two legal methods of computing tax and now seeks to change the election to the detriment of the revenue. E.g., *Pacific National Co. v. Welch,* 304 U.S. 191 (1938); *Estate of Stamos v. Commissioner,* 55 T.C. 468 (1970). Lastly, the use of date of

death values on the decedent's estate tax return does not preclude finding that an election under section 2032 has been made. See *Rosenfield v. United States,* 156 F. Supp. 780 (E.D. Pa. 1957), affd. per curiam 254 F.2d 940 (3d Cir. 1958).

We also do not agree that petitioner's protective election violates the rule that an election under section 2032 is "irrevocable". Respondent argues that if the protective election were triggered, then there would be a revocation of the selection of date of death values used on the estate tax return, in derogation of section 2032(d)(1). In effect, respondent argues that a protective or conditional election under section 2032 is incompatible with the requirement that the election is irrevocable.

Strictly speaking, however, the irrevocability of the election under section 2032 comes into play after the election is "once made". Sec. 2032(d)(1). Under the terms of petitioner's protective election, the thing that is subject to condition is whether the election is made in the first place. Under its terms, if the condition were not satisfied, i.e., if petitioner's election to use the special use valuation for tracts 1 and 2 were accepted, then petitioner would intend to make no election of the alternate valuation method. On the other hand, if the condition were satisfied, and the election of the alternate valuation method were triggered, then the election would be irrevocable, as required by section 2032(d)(1).

Moreover, we note that, like section 2032(d)(1), section 2032A(d)(1) states that the election to use the special use value of certain qualified real property shall be "irrevocable". Nevertheless, the regulations promulgated under section 2032A(d) specifically authorize the filing of a protective election. Sec. 20.2032A-8(b), Estate Tax Regs. Respondent's argument in this case does not explain why a protective election under section 2032 is incompatible with the requirement that the election is irrevocable, when a protective election can be made under section 2032A without violating the identical requirement that the election shall be irrevocable.

Respondent's second contention is that there is no statutory or other authority to make a "protective" election under section 2032. It is equally true, however, as petitioner points out, that there is no authority prohibiting a protective election under section 2032. Indeed, we find nothing in Form 706

or in the instructions to that form to say that a protective election under section 2032 cannot be made.

We have approved a similar election under section 4942(h), relating to the treatment of qualifying distributions by a private foundation, where neither the Code section nor the regulations specifically authorize a protective or conditional election. See *H. Fort Flowers Foundation, Inc. v. Commissioner,* 72 T.C. 399, 408-410 (1979). In that case, the taxpayer, a private foundation, acknowledged on its 1975 return that the IRS might prevail on an issue relating to imposition of the 15-percent initial tax on undistributed income, under section 4942(a). The foundation sought to avoid the additional tax under section 4942(b) and it added a statement to its return which said: "If, and only if, the IRS should prevail, H. Fort Flowers Foundation, Inc. elects to have $67,897.95 of 1970 to 1973 earnings applied to 1975 qualifying distributions." *Id.* at 408-409. The Commissioner contended that this election under section 4942(h)(2) was invalid because it would become effective only after liability for the initial tax had been established by a final decision of this Court. In rejecting the Commissioner's argument, we stated as follows:

> We find petitioner's election clear and appropriate. There is no doubt what petitioner intended. Since petitioner cannot know until this case becomes final whether a correcting distribution is needed, the election is appropriately tailored to the problem it is intended to correct. Petitioner should not be forced to make an absolute election to correct a possible but not certain underdistribution in an earlier year until that underdistribution has been established. [*Id.* at 410.]

We see no meaningful distinction between *H. Fort Flowers Foundation* and the case before us.

Furthermore, the regulations under section 2032A, a companion provision, and the regulations under section 6166, a related provision, both expressly permit protective elections. Secs. 20.2032A-8(b), 20.6166-1(d), (g), Estate Tax Regs. By implication, these regulations suggest that a protective election under section 2032 can be made. For example, the fact that a protective election can be made under section 2032A, sec. 20.2032A-8(b), Estate Tax Regs., and the fact that a dual election under both section 2032 and section 2032A can be made, Rev. Rul. 88-89, 1988-2 C.B. 333; Rev.

Rul. 83-31, 1983-1 C.B. 225, suggest that a protective dual election can be made.

Respondent's third argument is that petitioner's protective election would allow it to "indefinitely postpone making a decision on the applicable valuation date." According to respondent, "petitioner's attempted protective election would read the timely election requirements of I.R.C. §2032 out of the Internal Revenue Code."

In considering this argument, we note that petitioner filed its protective election with a timely estate tax return. Therefore, the protective election was made within the time required by section 2032(d). See sec. 5h.4(b), Temporary Regs., 49 Fed. Reg. 35489 (Sept. 10, 1984), relating to Deficit Reduction Act elections. This is not a case in which the election was made after the due date, *Estate of Ryan v. Commissioner*, 62 T.C. 4 (1974); *Estate of Downe v. Commissioner*, 2 T.C. 967 (1943); *Estate of Flinchbaugh v. Commissioner*, 1 T.C. 653 (1943), or where the taxpayer attempted to make an election but failed to include essential information, see *McDonald v. Commissioner*, 89 T.C. 293 (1987), affd. in part and revd. in part 853 F.2d 1494 (8th Cir. 1988); *Estate of Gunland v. Commissioner*, 88 T.C. 1453 (1987). In this case, the "election" was made on a timely return and was complete—albeit conditional—as filed.

We further note that petitioner stated in its protective election that it chose the alternate valuation method under section 2032 if "the Special Use Valuation herein elected is for any reason disapproved". The occurrence of this condition was entirely beyond petitioner's control. Thus, we fail to see how petitioner's protective election allowed it "to indefinitely postpone making a decision on the applicable valuation date."

This third argument boils down to the contention that the election must become effective immediately at the time the election is to be made, that is, on the decedent's estate tax return filed no more than 1 year after the filing deadline, as prescribed by section 2032(d). This is just another way of expressing respondent's view that a protective or conditional election is not permitted and begs the question why. For example, as we have already observed, respondent does not explain why protective elections can be made under sections 2032A and 6166 but cannot be made under section 2032.

Similarly, respondent does not argue that the Government would be prejudiced by giving effect to petitioner's protective election. We see no prejudice ourselves.

In conclusion, we hold that petitioner's "protective alternate valuation election" is effective as an election under section 2032(d)(1). Because respondent has disputed nothing about the election other than its conditional nature, petitioner is entitled to value the gross estate in accordance with the alternate valuation method prescribed by section 2032.

*Decision will be entered under Rule 155.*