T.C. Memo. 1998-325


UNITED STATES TAX COURT


ESTATE OF LEWIS S. THOMPSON, III, DECEASED,
SYNOVUS TRUST COMPANY, SUCCESSOR EXECUTOR TO
SECURITY BANK AND TRUST COMPANY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 14929-96.                    Filed September 16, 1998.


     D died testate on Feb. 19, 1992.  At the time of
his death, D owned a 3,489-acre parcel of real property
(CMP), which was used to produce merchantable timber
and crops and as a hunting preserve.  P borrowed funds
from D's insurance trust for purposes of paying Federal
and State estate taxes and for the maintenance of CMP
pending the resolution of this dispute.

     On a timely filed Federal estate tax return, P
reported the value of CMP at its fair market value
(FMV).  P also made a valid protective election for
special use valuation of CMP under sec. 2032A, I.R.C.
In addition, P deducted the interest incurred on the
borrowed funds from the value of D's gross estate as an
administrative expense under sec. 2053(a)(2), I.R.C.

     On a timely filed amended estate tax return, P
claimed that it is entitled to a refund for overpayment

of Federal estate tax.  In that connection, P attempted to perfect its sec. 2032A, I.R.C., protective election with respect to approximately 2,929.1 acres of timberland located on CMP for which a "qualified woodlands" election had been made under sec. 2032A(e)(13), I.R.C.  P also increased the amount of its interest expense deduction under sec. 2053(a)(2), I.R.C.

R disallowed the sec. 2053(a)(2), I.R.C., interest expense deduction in its entirety, on the grounds that Georgia law requires prior court approval for the executor to borrow funds and that the interest expense was not "necessarily" incurred for the administration of the estate within the meaning of sec. 20.2053-3, Estate Tax Regs.  R accepted the FMV of CMP as reported on the original estate tax return.

1.  Held: P failed to supply the information and documentation necessary under sec. 2032A(e)(7)(A) and secs. 20.2032A-4(b)(2) and -8(a)(3), Estate Tax Regs., to perfect its protective election for special use valuation with respect to the subject property; therefore, P is required to value CMP at its undisputed FMV on the date of decedent's death; i.e., $2,882,000. Sec. 2031(a), I.R.C.; Estate of Strickland v. Commissioner, 92 T.C. 16 (1989), followed.

2.  Held, further, P is entitled to deduct as an administrative expense under sec. 2053(a)(2), I.R.C, interest incurred on the funds borrowed from D's insurance trust.


Robert H. Hishon, for petitioner.

Clinton M. Fried, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

NIMS, Judge:  Respondent determined a deficiency of $101,192 in the Federal estate tax of the Estate of Lewis S. Thompson, III (petitioner).

After a concession by petitioner, the issues for decision are as follows:

(1) Whether petitioner is entitled to value certain real property owned by Lewis S. Thompson, III, (decedent), at the time of his death pursuant to the special use valuation provisions of section 2032A; and (2) whether petitioner incurred an interest expense which is deductible under section 2053(a)(2).

All section references are to sections of the Internal Revenue Code in effect at decedent's date of death, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.

Some of the facts have been stipulated and are so found. The stipulated facts and attached exhibits are incorporated herein by this reference. Synovus Trust Company (Synovus), successor executor to Security Bank and Trust Company, had its principal place of business in Albany, Georgia, at the time the petition was filed.

## FINDINGS OF FACT

Decedent died testate on February 19, 1992. At the time of his death, decedent resided in Albany, Georgia. Decedent was divorced, and was survived by his four adult children and a brother.

The reported value of decedent's total gross estate at the date of his death, as adjusted under section 2032A(b)(3)(A), was $5,439,313. Among the assets included in decedent's gross estate

were publicly traded stock valued at $1,335,344; mortgages, notes, and cash in the amount of $67,632; and life insurance in the amount of $400,740.

On the date of his death, decedent also owned a 3,489-acre irregularly shaped parcel of real property known as Cane Mill Plantation (Cane Mill) located in Dougherty County, Georgia. Under the terms of decedent's Last Will and Testament (will), Cane Mill was left in trust for his 4 children.

Cane Mill is composed of property having the following characteristics:

| Land Class | Acres |
|---|---|
| Irrigated cropland | 160 |
| Dry cropland | 378 |
| Pasture land | 22.2 |
| Upland timberland | 2,378.3 |
| Bottom timberland | 550.8 |
| Total | 3,489.3 |

The highest and best use of Cane Mill for all relevant times in this case was for the production of merchantable timber and crops and as a hunting preserve.

Decedent's Irrevocable Insurance Trust (Trust) held an insurance policy on decedent's life in the face amount of $2 million. After decedent's death, the Trust collected the insurance proceeds and interest earned thereon for an aggregate amount of $2,011,562.

Item Seven of decedent's will provides in pertinent part that "Any and all estate or inheritance taxes shall be paid from

the residue of my estate, and no claim shall be made against any life insurance beneficiary for payment of any part of such taxes."

Item Ten of decedent's will provides in pertinent part that the "Executor * * * shall, <u>without order of any court</u>, have the power to:  * * * Borrow money for any purpose that the fiduciary may deem proper."  (Emphasis added.)

On November 17, 1992, the executor borrowed $2 million from the Trust without the approval of any court.  The executor executed a promissory note (Note) in favor of the Trust in the amount of $2 million, bearing annual interest at the rate of 5 percent, with principal and interest payable 1 year from the date the Note was executed.  New 1-year notes with differing interest rates were thereafter executed on November 17, 1993, July 26, 1995, and July 26, 1996.  Additional notes dated July 26, 1995, and July 26, 1996, representing the capitalization of interest due on the Note, were executed by petitioner in the amounts of $123,834.44 and $111,070.64, respectively.

Petitioner used the funds borrowed from the Trust to pay Federal and Georgia estate taxes in the respective amounts of $1,665,000 and $355,000, as well as to pay expenses for the ongoing maintenance and preservation of Cane Mill pending the resolution of the issues in this case.  As of the date of trial, the funds borrowed from the Trust had not been repaid.

Petitioner timely filed Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return (original return), on May 19, 1993. On Schedule A, Real Estate, attached thereto, petitioner valued Cane Mill at $2,882,000, its fair market value (FMV) as determined by its appraiser, Eley C. Frazer III (Frazer). Petitioner made a valid protective election for special use valuation under section 2032A with respect to Cane Mill on the Schedule A-1, Section 2032A Valuation, attached to the original return. Petitioner also made a "qualified woodlands" election pursuant to section 2032A(e)(13) with respect to 2,929.1 acres of timberland located on Cane Mill. In addition, petitioner claimed a deduction for interest on the Note in the amount of $49,589 on Schedule J, Funeral Expenses and Expenses Incurred in Administering Property Subject to Claims, attached to the original return. Petitioner also claimed a deduction in the amount of $545,536 for alimony due decedent's former wife under the terms of their divorce on Schedule K, Debts of the Decedent, and Mortgages and Liens, attached to the original return.

By letter dated January 10, 1996, respondent's estate tax attorney, Travis Vance III, advised petitioner that respondent proposed to make certain adjustments to decedent's taxable estate, none of which were related to the FMV of Cane Mill as reported on the original return. On March 8, 1996, petitioner timely filed an amended Form 706 (amended return) in an effort to

perfect its protective election for special use valuation. On Schedule A-1, petitioner claimed a special use value for the qualified woodlands in the amount of $375,711 (compared to the woodlands' reported FMV of $2,028,730). The remainder of the Cane Mill property was reported at its FMV of $853,270.

On the Schedule A attached to the amended return, petitioner reported a total value of $2,132,000 for the Cane Mill property. This amount represents the FMV of Cane Mill as reported on the original return, $2,882,000, less $750,000, the maximum allowable reduction for special use valuation under section 2032A. See sec. 2032A(a)(2). Furthermore, on Schedule J of the amended return, petitioner increased the amount of its section 2053(a)(2) interest expense deduction with respect to funds borrowed from the Trust to a total of $265,754. In connection with these amendments, petitioner claimed a refund for an overpayment of estate tax in the amount of $369,248 on line 28 of the amended return.

Respondent issued a statutory notice of deficiency to petitioner on April 23, 1996. Among other adjustments to decedent's gross estate, respondent disallowed the interest expense deduction in its entirety. Respondent further disallowed the deduction for alimony paid to decedent's former spouse to the extent it exceeded $400,000. (Petitioner has conceded that the proper amount of the alimony deduction is $400,000.) Respondent

made no adjustment to the FMV of Cane Mill as reported on the original return.

OPINION

Petitioner asks us to find an overpayment of its Federal estate tax. We have jurisdiction to determine the amount of any overpayment of petitioner's Federal estate tax since respondent has determined a deficiency therein. Sec. 6512(b); Barton v. Commissioner, 97 T.C. 548, 552 (1991). We must first decide whether petitioner is entitled to special use valuation under section 2032A for the qualified woodlands situated on Cane Mill. We must also decide whether petitioner is entitled to deduct interest expense incurred on funds borrowed from the Trust pursuant to section 2053(a)(2).

I. Section 2032A Special Use Valuation

Generally, a decedent's gross estate subsumes the fair market value of the decedent's interest in all property in which he owned an interest at the time of his death. Secs. 2032(a); 2033. However, in the case of certain real property used by the decedent or a member of his family for farming or in a closely held business, section 2032A allows the decedent's personal representative to elect to value the real property on the basis of its value as a farm or in the closely held business, rather than the fair market value of such property based on its "highest and best use". Sec. 2032A(e)(7) and (8); Stovall v. Commissioner, 101 T.C. 140, 146 (1993); sec. 20.2032A-3(a),

Estate Tax Regs. The fact that the highest and best use of real property may coincide with its special use, as here, does not preclude special use valuation under section 2032A. Sec. 20.2032A-3(a), Estate Tax Regs.

Section 2032A was added to the Code by the Tax Reform Act of 1976, Pub. L. 94-455, sec. 2003, 90 Stat. 1520, 1856. The purpose of the special valuation provision is to reduce the estate tax burden, thereby alleviating liquidity problems faced by the surviving family of a person who dies owning real property used as a farm or in a closely held business. H. Rept. 94-1380 at 21-22 (1976), 1976-3 C.B. (Vol. 3) 735, 755-756; S. Rept. 94-938 (Part 2), at 15 (1976), 1976-3 C.B. (Vol. 3) 643, 657. Congress sought to allow the family to continue operating the farm or other business, rather than force the sale of the land to pay estate taxes. Estate of Mapes v. Commissioner, 99 T.C. 511, 516-617 (1992); H. Rept. 94-1380, supra, 1976-3 C.B. (Vol. 3) at 755-756; S. Rept. 94-938 (Part 2), supra, 1976-3 C.B. (Vol. 3) at 657.

Although section 2032A is a relief statute designed to encourage, among other things, the continuation of family farms, it provides for "exceptionally favorable tax treatment", and taxpayers must "come within its demanding terms". Martin v. Commissioner, 783 F.2d 81, 82, 84 (7th Cir. 1986), affg. 84 T.C. 620 (1985). An estate must meet a number of conditions for property to be eligible for special use valuation: (1) The

decedent must have been a citizen or resident of the United States, and the subject property must be located in the United States; (2) at least 50 percent of the adjusted value of the gross estate must consist of the adjusted value of real or personal property which, on the date of decedent's death, was being used for a qualified use by the decedent or a member of his family, and was acquired from or passed from the decedent to a qualified heir; (3) a minimum of 25 percent of the adjusted value of the gross estate must consist of the adjusted value of real property that passes to a qualified heir and that at least 5 years in the 8-year period immediately preceding decedent's death was owned by decedent or a member of his family and used for a qualified use; and (4) the decedent or a member of his family must materially participate in the operation of the farm or business. Secs. 2032A(a)(1) and (b)(1).

The above requirements all show Congress' intent to limit the tax relief to what is generally regarded as a family farm or business. See Estate of Heffley v. Commissioner, 89 T.C. 265, 271 (1987), affd. 884 F.2d 279 (7th Cir. 1989); Estate of Geiger v. Commissioner, 80 T.C. 484, 488 (1983). Moreover, the benefit afforded by section 2032A is not open-ended; the maximum aggregate reduction in value allowable by the statute for qualified real property with respect to any decedent is $750,000. Sec. 2032A(a)(2).

Special use valuation is not automatic. Estate of Gardner v. Commissioner, 82 T.C. 989 (1984). Rather, the executor must elect special use valuation on a Federal estate tax return, and file the agreement referred to in section 2032A(d)(2). Sec. 2032A(a)(1)(B). A protective election may be made, as here, to specially value qualified real property. Sec. 20.2032A-8(b), Estate Tax Regs. (On brief, respondent has conceded that, for purposes of this case, petitioner made a valid protective election for special use valuation under section 2032A on the original return.) In addition, although an election need not include all real property included in an estate which is eligible for special use valuation, sufficient property to satisfy the threshold requirements of section 2032A(b)(1) must be specially valued under the election. Sec. 20.2032A-8(a)(2), Estate Tax Regs. (Respondent does not dispute that this last requirement has been satisfied.)

Section 2032A(d)(1) directs the Secretary to prescribe regulations to establish the manner in which the special use valuation election is to be made. See Estate of Gunland v. Commissioner, 88 T.C. 1453, 1455 (1987). To that end, section 20.2032A-8(a)(3), Estate Tax Regs., lists 14 items of information that the executor must submit with the Federal estate tax return, including the fair market value of the real property to be specially valued under section 2032A and its value based on its qualified use, as well as the method used to determine the

subject property's special use value.  Sec. 20.2032A-8(a)(3)(iv) and (viii), Estate Tax Regs.  (On brief, petitioner asserts the "Petitioner timely perfected its election for special use valuation" under section 2032A(d)(3), and respondent does not challenge this assertion.)

The method of valuation under section 2032A is an integral part of the statutory scheme.  See Estate of Sequeira v. Commissioner, T.C. Memo. 1995-450.  Here, petitioner sought to perfect its protective election with respect to the qualified woodlands under the income capitalization method set forth in section 2032A(e)(7)(A).  This method measures the present value of the projected future cash-flows from the real property by using cash rent figures for the 5 years preceding decedent's death.  Sec. 2032A(e)(7)(A); Estate of Strickland v. Commissioner, 92 T.C. 16, 24 (1989).

Under the income capitalization method, a computation is made of the "average annual gross cash rental" for comparable land used for farming purposes and located in the locality of such farm (comparable land).  (Gross cash rental is the amount of cash received during the year for the use of actual tracts of comparable farmland in the same locality, undiminished by any expenses or liabilities associated with the farm operation.  Sec. 20.2032A-4(b)(1), Estate Tax Regs.; see Estate of Klosterman v. Commissioner, 32 F.3d 402, 404 (9th Cir. 1994), affg. 99 T.C. 313 (1992).)

From the average annual gross cash rental, as above computed, the average annual State and local real estate taxes for the comparable land is subtracted. The result of the subtraction is then divided by the average annual effective interest rate for all new Federal Land Bank loans. Sec. 2032A(e)(7)(A). (The IRS issues an annual revenue ruling setting forth the effective interest rate for each of the regional Federal Land Bank Districts. The effective interest rate for the Columbia Farm Credit Bank district in which the respective property is located was 10.87 percent for 1992. Rev. Rul. 92-12, 1992-1 C.B. 311.) The quotient resulting from the foregoing division is the special use value of the qualified real property.

Petitioner claims to derive its special use value of the subject property from the annual cash rental value of $15 per acre set forth in the May 10, 1993, special use valuation report (report) of its expert, Frazer. (We note that the figure of $375,711 reported on the amended return appears nowhere in Frazer's report, nor has the Court been able to determine how such a special use value was reached by petitioner. Based on our calculations, and assuming for this purpose only that Frazer's $15 per acre cash rental value for the subject property is correct, 2,929.1 acres of qualified woodlands times $15 per acre, without subtracting property taxes (Frazer stated that these were usually paid by lessees in these types of leases, so it is assumed that Frazer's $15 per acre is a net figure), equals

$43,936.50.  Dividing this amount by the capitalization rate of 10.87 results in a special use value for the subject property of $404,199.63.  Petitioner contends that the report attached to the amended return fully comports with the requirements of section 2032A(e)(7) and accompanying regulations, and that petitioner's protective election has thereby been perfected.  Petitioner further maintains that the subject property was used for a qualified use, and that decedent materially participated in its operation.  (No other requirements of section 2032A are in issue.)

Respondent argues, on the other hand, that petitioner failed to properly perfect its election with respect to the qualified woodlands on the amended return.  More specifically, respondent argues that, in electing to value the subject property pursuant to section 2032A(e)(7)(A), petitioner failed to identify comparable properties and annual gross cash rent figures as required.  Respondent also argues that petitioner failed to demonstrate that the subject property was in qualified use and that decedent materially participated in its operation.

Section 20.2032A-4(b)(2), Estate Tax Regs., describes the documentation required from the executor in order to value property under section 2032A(e)(7)(A).  The regulation states that "The executor must identify to the Internal Revenue Service actual comparable property for all specially valued property and cash rentals from that property" for each of the 5 calendar years

preceding the year of the decedent's death. Sec. 20.2032A-4(b)(2)(i) and (iv), Estate Tax Regs.

The determination of whether property is comparable is a factual one and is made according to "generally accepted real property valuation rules". Sec. 20.2032A-4(d), Estate Tax Regs. Factors to be considered in such a determination include, but are not limited to, whether the property is situated in the same locality as the specially valued property; whether the property is segmented or unified; whether the property is subject to flooding; and, in the case of timberlands, the comparability of the timber to the timber located on the property to be specially valued. Sec. 20.2032A-4(d), Estate Tax Regs.

Frazer utilized 8 timberland properties as comparables in his report. The report identified the lessor and lessee, the location of the property, the initial year of the lease, and the cash consideration paid for each of the 8 properties used as comparables. The report also listed the "Adjusted Net Lease Income/Acre" for the 8 properties and the "Average" thereof ($15). The report indicated no adjustments to any of the 8 properties used as comparables based on the factors set forth in section 20.2032A-4(d), Estate Tax Regs.

For the following reasons, we conclude that the report is completely unreliable as to whether any of the 8 properties were indeed comparable to the subject property. The putative comparables ranged in size from 44 acres to 34,365 acres, yet no

adjustment to any of them was made for size even though the substantially disparate sizes of the properties would appear to have some significance in terms of economies of scale. Frazer also did not make any adjustments for location, land quality, or timber type/maturity in his report. Moreover, no description of the properties was contained in the report, from which Frazer appears implausibly to be inferring that they were sufficiently similar so as to warrant none of the above adjustments.

We are also not convinced that the special use valuation of the subject property was based on actual cash rents of the putative comparables as is called for under the regulations. Section 20.2032A-4(b)(2)(iii), Estate Tax Regs., provides that "appraisals or other statements regarding rental value as well as area-wide averages of rentals * * * may not be used under section 2032A(e)(7) because they are not true measures of the <u>actual cash rental value of comparable property</u> in the same locality as the specially valued property." (Emphasis added.)

Although in effect for the 5 years preceding decedent's death in 1992, the 8 timberland leases were entered into over the 27-year period from 1957 through 1984. For those leases which did not contain rent escalation clauses, Frazer claimed to have applied the "Producer Price Index" (PPI) to the consideration stated therein in an effort to calculate the market rental value of those properties for the 5-year period preceding decedent's

death. The result was termed the "Adjusted Net Lease Income/Acre" in his report.

Petitioner requests that the Court take judicial notice of Report 807, Escalation and Producer Price Indexes: A Guide for Contracting Parties issued by the U.S. Department of Labor, Bureau of Labor Statistics in September 1991 for the purpose of establishing that the PPI can be applied to contract rents to calculate accurately fair market rents for future years in the absence of escalation clauses, as Frazer claims to have done.

Rule 201 of the Federal Rules of Evidence provides in part:

> (a) Scope of rule. This rule governs only judicial notice of adjudicative facts.

> (b) Kinds of facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned.

We take judicial notice of Report 807. However, we do not find Report 807 relevant for the purpose for which it is offered by petitioner. Fed. R. Evid. 401. Contrary to petitioner's argument, Report 807 does not support the proposition that market rents for the relevant period can be accurately calculated from contract rents entered into several decades beforehand via the application of the PPI for purposes of section 2032A(e)(7)(A) for those leases which do not themselves contain rent escalation clauses. Rather, Report 807 provides guidance to contracting parties with respect to the use of price adjustment clauses at

the time the contract is entered into.  In that connection, Report 807 states

> This report provides guidance on the development of escalation clauses in contracts which are to be tied to Producer Price Index data. * * *
>
> * * * Because index methodology and publication conventions could be crucial in developing escalation clauses, this report is intended to alert users to potential problems arising in these areas.

Even if Report 807 could be construed to support the proposition for which it is offered, Frazer's report failed to indicate which index he relied upon to come up with the adjusted net lease income per acre figures for the properties used as comparables.  This omission flies in the face of the guidelines set forth in Report 807, one of which admonishes contracting parties to avoid "Vague citation of 'the Producer Price Index' rather than a reference to a specific index by its title and any identifying code number."  Moreover, upon being questioned by the Court, Frazer was unable to explain the calculations leading to his adjusted net lease income per acre figures.  Cf. Estate of Sequeira v. Commissioner, T.C. Memo. 1995-450 ("The regulations * * * require more than a brief narrative and calculations on the return.  The regulations require that petitioner be able to substantiate these figures with supporting documentation").

We think that Frazer's adjusted net lease income per acre figures are more akin to an appraisal, which is expressly prohibited by section 20.2032A-4(b)(2)(iii), Estate Tax Regs.,

rather than an accurate calculation of the cash rents required thereunder.

As a further indication of his report's unreliability, Frazer testified that the adjusted net lease income per acre figures for each of the 8 properties used as comparables were not used to derive an average gross cash rental for the 5 years preceding decedent's death, despite the fact that section 2032A(e)(7)(A) expressly requires this to be done. Rather, Frazer explained that the $15 per acre "Average" used to calculate the special use value of the subject property was an amount based on his "personal knowledge". Frazer stated that "I chose what I thought would be the indicated market rent for what I knew about the whole business, and that's it." Frazer conceded that his report failed to adequately explain the $15 figure. Petitioner attempts to gloss over the report's fundamental flaws by stating that "Based on * * * [Frazer's] knowledge and experience in valuing timberland, the $15 per acre rate was the appropriate valuation rate within this range." However, an amount that Frazer himself termed a "judgment call" does not suffice for purposes of satisfying the stringent terms of section 2032A(e)(7)(A). See Martin v. Commissioner, 783 F.2d at 84.

Finally, Frazer testified that he validated his estimate of the cash rental rate for the Cane Mill timberland by reference to the prevailing rental rate for cropland during the relevant period. However, there is no evidence in the record as to how

this comparison was made, or even that timberland and cropland rental rates are in any way proximate.

In view of the foregoing, we conclude that petitioner has failed to identify comparable real properties and cash rentals therefor within the meaning of section 2032A(e)(7). See sec. 20.2032A-4(b)(2), Estate Tax Regs. As a result, petitioner has not established the special use value of the Cane Mill timberland. Sec. 20.2032A-8, Estate Tax Regs. We hold, therefore, that petitioner has failed to perfect its protective election for special use valuation under section 2032A; petitioner is required to value the entire Cane Mill property at its undisputed FMV on the date of decedent's death; i.e., $2,882,000. Sec. 2031(a); see Estate of Strickland v. Commissioner, 92 T.C. at 33.

Because of our holding above, we need not consider whether the subject property was in qualified use or whether decedent materially participated in its operation. See Estate of Strickland v. Commissioner, 92 T.C. at 33 n.12.

II. Section 2053 Administrative Expenses

Section 2053(a) provides in part that the value of a decedent's taxable estate shall be determined by deducting from the value of the gross estate such amounts for administrative expenses as are allowable by the laws of the jurisdiction under which the estate is being administered. Section 20.2053-3(a), Estate Tax Regs., provides further that the

amounts deductible from a decedent's gross estate as 'administration expenses' * * * are limited to such expenses as are <u>actually and necessarily incurred in the administration of decedent's estate</u>; that is, in the collection of assets, payment of debts, and distribution of property to the persons entitled to it. * * * Expenditures not essential to the proper settlement of the estate, but incurred for the individual benefit of the heirs, legatees, or devisees, may not be taken as deductions. Administration expenses include (1) executor's commissions; (2) attorney's fees; and (3) miscellaneous expenses. [Emphasis added.]

In defining "miscellaneous" administration expenses, section 20.2053-3(d), Estate Tax Regs., provides that

Expenses necessarily incurred in preserving and distributing the estate are deductible, including the cost of storing or maintaining property of the estate, if it is impossible to effect immediate distribution to the beneficiaries. Expenses for preserving and caring for the property may not include outlays for additions or improvements; nor will such expenses be allowed for a longer period than the executor is reasonably required to retain the property.

Respondent does not dispute that petitioner is entitled to deductions under section 2053(a)(2) for its legal fees and appraisal fees to the extent such fees are substantiated. Respondent also does not take issue with the general proposition that interest on funds borrowed to pay estate tax liabilities, among other things, may be deductible as administration expenses. See, e.g., <u>Estate of Todd v. Commissioner</u>, 57 T.C. 288 (1971); <u>McKee v. Commissioner</u>, T.C. Memo. 1996-362. Rather, respondent argues that Georgia, the jurisdiction under which the estate is being administered, requires prior court approval for an estate to incur an interest expense for borrowed funds, which approval

petitioner did not obtain.  In addition, respondent argues that the interest expense at issue was not "necessarily" incurred within the meaning of section 20.2053-3, Estate Tax Regs.

We first look to Georgia law to determine whether the interest expense claimed by petitioner as an administration expense is properly deductible thereunder.  See Estate of Todd v. Commissioner, supra at 294-296; McKee v. Commissioner, supra.

Former Georgia Code section 53-7-7, applicable to decedents dying before January 1, 1998, provides in pertinent part as follows:

> (a) An executor * * * shall have the legal right to borrow money * * * for the purpose of paying any gift, estate, inheritance, income, sales, or ad valorem taxes due the United States * * * [or] state * * *.

> (b) An executor * * * desiring to borrow money shall petition the judge of the probate court, setting forth the facts, and shall specify in his petition the amount of money to be borrowed, the purpose for which the same shall be used, the rate of interest to be paid, the property to be pledged as security, and the period of time over which the money is to be repaid. * * *  After a hearing, if the judge is satisfied of the truth of the allegations in the petition and deems it in the best interest of the estate, an order shall be passed granting leave to borrow money and encumber the estate or any part thereof, specifying the portion of the estate to be bound as definitely as possible. The order by the judge granting permission * * * to borrow shall be binding, final, and conclusive * * * provided, however, that nothing in this Code section shall prevent any party at interest from entering an appeal from the order within the time provided by law; and provided further that nothing in this Code section shall limit the powers contained in the will of a decedent.  [Emphasis added.]

We take the underscored language above to mean that an executor need not petition the probate court judge for permission to borrow funds if a decedent's will otherwise invests the executor with such authority. In this case, Item Ten of decedent's will unequivocally states that the executor may borrow money without a court order "for any purpose that the fiduciary may deem proper." We therefore conclude that the interest incurred on the borrowed funds is an allowable administration expense under Georgia law. See Estate of Todd v. Commissioner, supra at 295 n.4.

We must now consider whether interest on the Note was "necessarily incurred in the administration of the decedent's estate." Sec. 20.2053-3(a), Estate Tax Regs.; see Estate of Todd v. Commissioner, supra; McKee v. Commissioner, supra.

Petitioner argues that, without the borrowed funds, the estate would have been required to exhaust all of its liquidity to pay its estate taxes and, even then, a shortfall would have remained. Moreover, no funds would have been left to provide for the ongoing costs of maintenance and preservation of Cane Mill until such time as that asset could be distributed to decedent's heirs. Thus, petitioner asserts, the interest expense was necessary and appropriate in the fiduciary's administration of the estate.

Respondent, on the other hand, argues that the estate held sufficient liquid assets from which its Federal and State estate

tax liabilities could have been paid.  In that connection, respondent maintains that the executor resorted to borrowing funds from the Trust rather than selling such assets (which included such publicly traded stocks as Synovus, Exxon, and Amoco), in order for decedent's heirs to reap the benefit of anticipated appreciation of the stocks.  In effect, respondent argues that the interest expenditure was incurred for the benefit of decedent's heirs, rather than the estate, in contravention of section 20.2053-3(a), Estate Tax Regs.

We are convinced that the financial position of the estate at the time of the borrowing was insufficient to make the required tax payments and provide for the maintenance of Cane Mill until such time as the asset could be distributed to decedent's heirs.  Cf. Estate of Street v. Commissioner, T.C. Memo. 1994-568.  In that connection, William O. Dorough, Jr., a senior vice president of Synovus and the individual responsible for the administration of decedent's estate from the date of decedent's death, testified credibly that a shortfall of approximately $600,000 existed between estate tax liabilities and liquid assets (the publicly traded stocks) available to pay them.

Contrary to respondent's assertion, the $400,740 in life insurance proceeds includable in the gross estate was not available to the estate for purposes of paying its estate tax liability, inasmuch as Item Seven of decedent's will provides that all estate taxes shall be paid out of the residuary, and

that no claim "shall be made against any life insurance beneficiary for payment of any part of such [estate] taxes." See Estate of Papson v. Commissioner, 73 T.C. 290, 297 n.7 (1979). Even if the life insurance proceeds were available, a gap of almost $200,000 remained between liquid assets and estate tax liabilities.

Although respondent has suggested that the executor could have clearcut merchantable Cane Mill timber to make up the difference, Dorough testified that this fairly drastic measure would not have supplied the estate with the necessary amount of funds, and he did not consider this course of action advisable.

In addition to its estate tax liabilities, Dorough testified that the estate had other obligations, including liability for property taxes, the salaries of two regular employees, and the wages of occasional laborers, all of which required the retention of a certain amount of liquidity pending the resolution of the instant dispute, inasmuch as the estate itself did not generate sufficient income to maintain the Cane Mill operations.

This Court stated in Estate of Sturgis v. Commissioner, T.C. Memo. 1987-415 that "we are not prepared to second guess the judgments of a fiduciary not shown to have acted other than in the best interests of the estate." The same sentiment holds sway in the instant case; the regulations under section 2053 do not require that an estate totally deplete its liquid assets before an interest expense can be considered necessary.

Moreover, we do not think that the interest expense was incurred for the benefit of decedent's heirs. See sec. 20.2053-3(a), Estate Tax Regs. Although Dorough testified that the value of the stocks retained by the estate had indeed increased after the Note was executed, to the benefit of decedent's heirs, such an increase could not have been forecast at the time of the borrowing. As Dorough explained, predictions as to the direction of the market were "very uncertain".

In any event, retaining the marketable securities for potential appreciation does not strike us as the sole or even principal factor for retaining the stocks given the estate's liquidity problem. Although not identical, we think that <u>Marcus v. DeWitt</u>, 704 F.2d 1227, 1232 (11th Cir. 1983), involving the deductibility of expenses incurred in the sale of a decedent's residence, is analogous to the instant case. In <u>Marcus</u>, the Court of Appeals for the Eleventh Circuit, to which an appeal of this case would ordinarily lie, stated that "If the sale was made for the benefit of the estate it is not significant that the beneficiaries also benefitted. The law is well established that such dual benefit does not affect deductibility." Accord <u>Estate of Papson v. Commissioner</u>, <u>supra</u> at 295; compare <u>Estate of Posen v. Commissioner</u>, 75 T.C. 355, 365 (1980) (disallowing deduction for expenses related to the sale of an apartment upon a finding that the sale was "made <u>solely</u> for the benefit of * * * [decedent's daughter] as heir.") (Emphasis added.)).

We also do not think that the interest expense was unnecessary because the administration of the estate has been unduly prolonged.  Sec. 20.2053-3(d), Estate Tax Regs.  Contrary to respondent's argument, the facts here differ from those in Hibernia Bank v. United States, 581 F.2d 741 (9th Cir. 1978).  In Hibernia Bank, the court held that the estate's interest payments were unnecessary inasmuch as the estate's administration had been unduly prolonged.  In that case, all the specific bequests and claims had been paid out of the estate by December 1967.  Only two main estate assets remained:  a mansion and 10,000 shares of the executor's stock.  Rather than distribute the remaining assets, the executor attempted to sell the mansion, a feat not accomplished until 1972.  (The mansion was sold because the heirs preferred a cash distribution to certain residuary trusts rather than a distribution of undivided interests in the mansion.)  Rather than sell the stock, the executor borrowed funds for the upkeep of the mansion until it was sold.  There were, apparently, no affairs to be wound up or reason for the estate to remain open, other than the sale of the mansion.  In contrast, in the case before us, there is at least the matter of the estate's eligibility for special use valuation of the subject property which requires that the estate remain open.  Cf. Estate of Sturgis v. Commissioner, supra.

On the basis of the above discussion, we hold that petitioner is entitled to deduct interest incurred on funds

borrowed from the Trust pursuant to section 2053(a)(2).  The correct amount of such deduction will be calculated under Rule 155.

We have considered all other arguments advanced by the parties, and to the extent they are not addressed herein, we find them to be either not germane or unconvincing.

To reflect the foregoing and petitioner's concession,

<u>Decision will be entered under Rule 155</u>.